## Case No. 18,258.

### CHARGE TO GRAND JURY—THE CIVIL RIGHTS ACT.

### [1 Hughes, 541.] [1]

Circuit Court, W. D. North Carolina. April, 1875.

#### CIVIL RIGHTS BILL—EFFECT.

1. In North Carolina, the equal rights, in inns and public conveyances, of all persons without distinction of class, are fully protected by state statutes, and existed as to inns at common law; and the act of con-

gress commonly called the "Civil Rights Bill," was unnecessary in the state; and its only effect is to give jurisdiction of wrongs committed against citizens on account of class to the federal courts.

2. These laws, state and national, were intended to secure political and legal equality of rights to all citizens, but were not intended to establish social equality, or to enforce social intercourse between different classes of citizens.

3. Quære, whether the civil rights acts of congress are constitutional in so far as they legislate upon the rights which appertain to men in their character as citizens of the states as distinguished from those which belong to them as citizens of the United States?

The following opinion was given in response to inquiries from the grand jury, in regard to their duties under the act of congress just then passed, commonly called the "Civil Rights Bill.", See Acts 1874–75 [18 Stat.] c. 114, p. 335.

DICK, District Judge (charging grand jury). I will consider the subject in the following order: (1) What was the existing law before the passage of the act? (2) The provisions and purposes of the act. (3) Had congress the constitutional authority to pass the act?

Under the constitution and laws of the United States, and the constitution and laws of this state, the colored man is a free citizen, and entitled to the legal rights of all other citizens.

We propose, in the first place, to inquire what were the rights of persons at common law, before the passage of the civil rights bill, as to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances by land or water, theatres, and other places of public amusement. We will confine out attention chiefly to inns, as the principles of law in such cases are applicable to common carriers, and other public undertakings and employments. By referring to standard works which treat of this subject at common law, we will find the following principles established by frequent adjudication: A person who makes it his business to entertain travellers and passengers and provide lodgings and necessaries for them and their horses and attendants, is a common innkeeper; and it is no way material whether he have any sign before his door or not. 3 Bac. Abr. 660. The duty of innkeepers extends chiefly to entertaining and harboring travellers, finding them victuals and lodgings, and securing the goods and effects of their guests; and, therefore, if any one who keeps a common inn refuses either to receive a traveller as a guest into his house, or to find him victuals and lodging, upon his tendering him a reasonable price for the same, he is not only liable to render damages for the injury, in an action on the case, at the suit of the party grieved, but may also be indicted and fined at the suit of the king. For he who takes upon himself a public employment must serve the public as far as his employment goes. Id. 662. Also it is said that an innkeeper may be compelled by the constable of the town to receive and entertain a person as his guest. Id. 664. An inn has been judicially defined to be "a house where the traveller is furnished with everything which he has occasion for whilst on his way." But a mere coffee-house, or eating-room or boarding-house, is not an inn. 1 Pars. 623. One who entertains strangers occasionally, although he receives compensation for it, is not an innkeeper. Mathews' Case, 2 Dev. & B. 424. An innkeeper may refuse to receive a disorderly guest, or require him to leave his house. He is not bound to examine into the reasonableness of the guest's requirements. And while travellers are entitled to proper accommodations, they have no right to select a particular apartment, or to use it for purposes other than those for which it was designed. 1 Pars. 523.

The law only obliges an innkeeper to furnish proper and convenient accommodations for his guests, and in doing this, he may arrange his business to suit his own advantage, while he

---

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

complies with the reasonable requirements of his guests. This state and other states of the Union, have statute regulations upon the subject of inns. In every prosperous and commercial country there are laws upon this subject, as travellers and men of business must have places of entertainment where their reasonable wants of lodging and subsistence can be conveniently obtained. We find in ancient Rome, that the prætors established many wise regulations for the accommodation of travellers, which are very similar to the principles of the common law and our state statutes.

In this state we find a statute originally passed in 1798, which provides, that every person wishing to keep a common inn, tavern or ordinary for the entertainment of travellers and others, shall apply to the board of county commissioners for a license to do so, "and the applicant must give bond in the sum of one thousand dollars, payable to the state of North Carolina," and conditioned for finding and providing good and wholesome diet and lodgings for his guests, and stable and provender for their horses; and also to safely keep for his guests all such articles and property as may come to his care and charge as an innkeeper; and on breach of any condition thereof, any person injured may put the same in suit. Bat. Revisal, c. 81. This is a statute remedy in addition to the remedies at common law, and is secured by bond with sufficient sureties. This statute asserts the rights provided for in the civil rights bill, and secures them more effectually than the act of congress. The penalty in the act of congress is five hundred dollars without any security; but any damages incurred are secured in the state statutes by a thousand dollar bond with sureties. In both instances, if the statute remedy is pursued by the party injured, the common law remedies are waived. It is thus apparent that all the rights to the full and equal enjoyment of the advantages, accommodations, facilities, and privileges of inns, public conveyances, etc., are derived from the common law and state statutes, and fully existed before the passage of the civil rights bill. By the common law and statutes of this state, no discrimination is made against colored men as a class, or against non-resident citizens. The civil rights bill was, therefore, it would seem, unnecessary, so far as this state is concerned; and being unnecessary, the question arises whether congress, under any provision of the constitution, had the authority to legislate upon domestic and local subjects, which are properly under the control of state action. We will consider this question in a subsequent part of this charge.

Both the national and state governments have conferred upon the colored man all the legal rights of citizenship, and both governments would be untrue to themselves if those rights were not properly protected and enforced by suitable legislation. In political circles it may be said that the rights of citizenship ought not to have been conferred upon the colored man by the general government, and the Southern states acted under an unwarranted compulsion when they recognized and established those rights in their new state constitutions. Those states entered into a rebellion against the general government, to protect and secure the institution of slavery, and the Rebellion was suppressed by force of arms, and the government imposed upon those states certain fundamental conditions as prerequisites to their readmission into the Union. These fundamental conditions were accepted by the insurrectionary states, and were incorporated into their constitutions. The full rights of citizenship were thus conferred upon colored men by the amendments of the national and state constitutions, and directly resulted from the Rebellion, and were not created by the civil rights bill. If these rights were unjustly and improperly conferred the wrong is attributable to the Rebellion which brought on such consequences. These amendments to the national and state constitutions have been approved and adopted by the people in the manner provided by our fundamental law and are now a part of the law of the land, which courts of justice are bound to administer.

We will now consider what are the provisions and purposes of the civil rights bill. The first section enacts that all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances on land or water, theatres, and other places of public amusement; subject only to the conditions and limitations established by law and applicable alike to the citizens of every race and color, regardless of any previous condition of servitude. The second section provides that any person who shall violate the first section, shall be liable to a penalty of five hundred dollars, and also to an indictment for misdemeanor: the penalty to be recovered by suit of the party injured, and the indictment to be prosecuted in the federal courts. The third section gives to the federal courts exclusive jurisdiction of the suit and indictment mentioned in section 2, and makes it the duty of district attorneys, marshals, deputy marshals, and United States commissioners, to see that all offences under section 2 are properly prosecuted. Section 4 provides that no citizen shall be excluded from jury service in the national or state courts on account of race, color, or previous condition of servitude. Section 5 provides that all cases arising under this act in the federal courts, may be reviewed by the supreme court without regard to the sum in controversy. In this act we find all the usual safeguards which are adopted in the enactment of laws to prevent oppression and secure the rights of individual citizens. The purposes of the bill are fully expressed in the preamble: "Whereas, we recognize the equality of all men before the law, and hold that it is the duty of the government in its dealings with the people to mete out equal and exact justice to all of whatever nativity, race, color or persuasion, religious or political."

From the preamble and all the provisions of the act, it is obvious that the civil rights bill neither directly nor indirectly confers, nor was intended to confer any rights or privileges of social equality among men. Neither have the recent amendments of national or state constitutions any such purposes or effect. Every man has a natural and inherent right of selecting his own associates, and this natural right cannot be properly regulated by legislative action. but must always be under the control of individual taste and inclination. There have always been different circles in society, and this condition of things will ever remain among men. This natural right and inclination of selecting associates exists among the animals of every species. Even in free and enlightened Athens we find among the citizens of the republic well-defined social distinctions which could not be regulated by public law. The Athenians would not associate on terms of social equality with the most learned and distinguished foreigners, who were regarded as barbarians. They once put a citizen to death for interpreting into the language of his country the message of a Persian king. The iron laws of Sparta placed the citizens upon terms of social equality, and made them a nation of savage warriors and ignorant barbarians. The founders of Rome were a band of robbers and outlaws and mingled in free and equal social intercourse; but when Romulus selected the centum patres, the social distinction of patricians and plebeians was established, which for seven hundred years disturbed the peace of the kingdom and commonwealth, and led to the establishment of the empire. In England political and social distinctions have always existed, and cannot be broken down without the complete subversion of the government. The hope and expectation that there will ever be a nation on earth in which all men will asso-

ciate upon terms of social equality is a wild dream of fanaticism, which can never be realized. It certainly cannot be a matter of surprise that among the white people of the Southern states, there should be strong opposition to according equal social privileges to the colored race. The colored men were formerly slaves, and the condition of servitude rendered them greatly wanting in education, refinement and social culture. White men often came in contact with colored men, but the association was that of superiors with inferiors. Before the war, white men who associated with colored men on terms of social equality became degraded in the eyes of the community. These social prejudices naturally resulted from the condition of things and are too deeply implanted to be eradicated by any legislation. Any law which would impose upon the white race the imperative obligation of mingling with the colored race on terms of social equality would be repulsive to natural feeling and long established prejudices, and would be justly odious. There is no principle of law, human or divine, that requires all men to be thrown into social hotchpot in order that their equality of civil rights may be secured and enforced. The civil rights bill neither imposes nor was intended to impose any such social obligation. It only proposes to provide for the enforcement of legal rights guaranteed to all citizens by the laws of the land, and leaves social rights and privileges to be regulated, as they have ever been, by the customs and usages of society. I will briefly restate the principles of law which we have been considering as they exist in this state, independent of the civil rights bill. The law only requires innkeepers, common carriers, etc., to furnish accommodations to colored men, equal to those provided for white men, when the same price is paid. Innkeepers may have separate rooms and accommodations for colored men, but they must be equal in quality and convenience to those furnished white men. Railroad companies may have first class coaches for colored men, and first class coaches for white men. If white men are protected from the intrusion of colored men, colored men must likewise be protected from the intrusion of white men, as the legal rights of both classes are the same. Both races are alike entitled to receive convenient and comfortable accommodations in inns and public conveyances, and neither a white man nor a colored man has a right to say that the innkeeper shall put them in the same room without their mutual consent. If a traveller gets inn accommodations and comfortable transportation according to the price paid, he has no just cause of complaint, and the innkeeper and common carrier discharge the obligations imposed upon them by law. If the innkeeper tenders such accommodations, and the guest refuses them, he may compel the guest to quit the inn, and seek for accommodation elsewhere. Fell v. Knight, 8 Mees. & W. 276.

I have thus stated the conditions and limitations established by the common law and statute law of North Carolina, regulating the relative rights and responsibilities of innkeepers and their guests. If any person within the jurisdiction of this state is denied his legal rights by an innkeeper, the party injured has the following remedies under the state laws: (1) By civil action and indictment at common law, prosecuted in the superior court. (2) By civil action on innkeeper's bond, as provided by statute.

If these legal rights cannot be properly enforced by a colored man in the state courts, then he may remove his suit in the state courts to the federal court, under the civil rights bill of the 9th of April, 1866 [14 Stat. 27]. Thus, it would seem that under existing laws in this state, the colored man has all the rights and remedies of any other citizen, in relation to the subjects embraced in the civil rights bill. I am not aware that there is any law in North Carolina which in express terms makes any discrimination against the colored race, except

the statute regulating the domestic institution of marriage, and this subject is and must ever remain under the exclusive control of local state government. It has been alleged that a few municipal charters granted by the present legislature, in effect deprive colored citizens of some elective franchises which are enjoyed by white citizens. This subject is not embraced in the civil rights bill, and calls for no expression of opinion in this charge.

We will now proceed to consider the important question as to what extent congress has the constitutional authority to establish and regulate the civil rights of citizens of the United States in the several states. This question has recently been elaborately considered by the supreme court of the United States, in the Slaughterhouse Cases, 16 Wall. [83 U. S.] 36, and also by the supreme courts of Ohio and Indiana in the cases of State v. McCann [21 Ohio St. 198] and Cory v. Carter [48 Ind. 327]. In these cases the following principles of law may be regarded as established. We only refer to the salient points pertinent to our discussion. Previous to the adoption of the recent amendments to the constitution of the United States, with the exception of a few express prohibitions and restrictions in the federal constitution, "the entire domain of the privileges and immunities of citizens of the states lay within the constitutional and legislative power of the states, and without that of the federal government." The states, with the restrictions and prohibitions referred to, could establish and regulate the civil rights of their own citizens. But when those rights are established by state laws, the constitution declares to the states that those rights, neither more nor less, shall be the measure of the rights of the citizens of other states within their jurisdiction. And quoting from the language of Chief Justice Taney in another case, it is said, "that for all the great purposes for which the federal government was established, we are one people, with one common country, we are all citizens of the United States," and it is as such citizens that their rights are supported by the United States courts. The recent amendments to the constitution were intended to secure freedom and the benefits of citizenship to colored men, and protect their civil rights against hostile state legislation. All state laws which discriminate against colored men as a race, and deny them equal civil rights with other citizens, are now prohibited by the constitution, and may be declared unconstitutional by the courts; and congress may also enforce the civil rights thus denied, by suitable legislation.

A state has the constitutional and legislative power to change or modify the common law, and by statute establish and regulate the rights of its citizens to the enjoyment and benefit of inns, public conveyances, etc., but cannot deny to any citizen of the United States, within its jurisdiction, the equal protection of the laws. In the Slaughterhouse Cases [supra] it is said: "The clause which forbids a state to deny to any person the equal protection of the laws, was clearly intended to prevent the hostile discrimination against the negro race, so familiar in the states where he had been a slave, and for this purpose the clause confers ample power upon congress to secure their rights and equality before the law. We doubt very much whether any action by a state, not directed by way of discrimination against the negroes as a class, or on account of their race, will ever be held to come within the purview of this provision." As no such contingency had arisen in this state, as is contemplated by the fourteenth amendment, it may well be considered as a matter of grave doubt whether congress had the constitutional authority to legislate upon matters properly belonging to the local and domestic government of the state, when the state had in no way denied to persons within its jurisdiction the equal protection of the laws.

In a charge to a grand jury I will not pretend fully to discuss and decide upon the constitutionality of the civil rights bill, as this is an exceedingly delicate and important question, and one that has induced much public consideration and excitement.

Judge Cooley, in his learned and valuable treatise on Constitutional Limitations, at page 159 says: "It must be evident to any one that the power to declare a legislative enactment void, is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously do so, and with due regard to duty and official oath, decline the responsibility. Neither will a court, as a general rule, pass upon a constitutional question and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause. While the court cannot shun the discussion of constitutional questions, when fairly presented, they will not go out of their way to find such topics. They will not seek to draw in such weighty matters collaterally, nor on trivial occasions. It is both more proper and more respectful to a co-ordinate department to discuss constitutional questions only when that is the very lis mota. Thus presented and determined, the decision carries a weight with it to which no extrajudicial disquisition is entitled."

The constitutionality of the civil rights bill has been asserted by the deliberate action of congress, composed of many able lawyers and wise and enlightened statesmen, and it would be very presumptuous in me, collaterally, and without argument, to decide differently upon a question which that body carefully considered and acted upon under the solemn sanction of official obligation. "It is a solemn act in any case to declare that that body to whom the people have committed the solemn function of making the laws of the commonwealth, have deliberately disregarded the limitations imposed upon their delegated authority, and usurped power which the people have been careful to withhold." Cooley, Const. Lim. 160. This question will doubtless soon be decided by the supreme court of the United States, and when determined by that august tribunal, I feel confident that the decision will be acquiesced in by all the American people disposed to observe the law of the land. Although the constitutionality of the civil rights bill may be questioned, the act cannot properly be regarded as an oppressive exercise of legislative power. It only re-enacts the law already in force in this state, and furnishes new remedies not more stringent than those existing at common law and under our state statutes. It provides that those remedies shall be enforced in the federal courts, where all cases are tried by juries composed of just, impartial and enlightened citizens of the state, selected as state juries are selected; and the legal rights of parties are under the final control of the supreme court of the United States, consisting of learned and just judges, whose opinions are regarded as high authority in all the courts of this country and England. In the civil rights bill the legislative will of the nation has been solemnly expressed by the chosen representatives of the sovereign people; and it is to be hoped that all good citizens will yield obedience to the law, feeling well assured that the vexed and difficult constitutional questions which it involves, will be properly determined, and the rights of all citizens be justly administered by the judicial department of the government. This course of conduct will be in conformity to the true theory and spirit of our federal and state governments, and manifest the patriotic loyalty of our people.

If, therefore, any bill of indictment founded upon the civil rights bill is presented by the district attorney for your action, it is your duty to pass upon such bill as you pass upon all other bills, and leave the constitutionality of the act to be determined by the court upon mature consideration, after being aided and enlightened by the careful investigations and able and learned arguments of counsel.