STATE OF NORTH CAROLINA EX REL. CORPORATION COMMISSION v.
TRANSPORTATION COMMITTEE OF THE NORTH CAROLINA COM-
MISSION ON INTERRACIAL CO-OPERATION.

(Filed 12 February, 1930.)

Constitutional Law G a; Corporation Commission A c—Commission has
power to require bus lines to provide equal separate accommodations
for races.

The Corporation Commission is given plenary power by statute to
require bus lines operating between points within the State in carrying
passengers for hire, which are public-service corporations, to provide in-
discriminatory separate accommodations for the carriage of white and
negro passengers, and for their separate accommodations at the bus

stations, the working out of the plans or details for the purpose being vested largely within the discretion of the Commission, and where this is done without racial discrimination it is not objectionable as being in contravention of Thirteenth and Fourteenth Amendments to the Federal Constitution. C. S., 3494, 3497, amended by chapter 216, Public Laws of 1929, and section 7, Public Laws of 1927. Hotels, theatres, etc., distinguished from public-service corporations, and the policy of our State with regard to the equal treatment of the negro race discussed by Mr. JUSTICE CLARKSON.

APPEAL by plaintiff from *Barnhill, J.,* at Chambers, Rocky Mount, N. C., 27 March, 1929. From WAKE. Affirmed.

The judgment of the court below is as follows:

"After examination of the record and hearing argument of counsel, the court holds:

1. That the petition herein filed originally before the Corporation Commission and constituting a part of the record of this case states and sets forth a matter or cause of action within the cognizance and jurisdiction of the Corporation Commission, and that bus operators who have received franchises to transport passengers for hire, pursuant to chapter 136, Public Laws of 1927, and other pertinent statutes, and who have undertaken to operate pursuant to such franchises and who enjoy the privileges and immunities of such franchises are common carriers.

2. That chapter 136, Public Laws of 1927, and other pertinent statutes confer upon the Corporation Commission full power and authority to make reasonable rules and regulations governing and regulating the transporting of all passengers, including negroes, on buses and to require that bus operators operating under a general and unlimited franchise provide equal but separate accommodations for white and negro passengers.

3. That the legislative enactment of 1929, to wit: House Bill No. 196 and Senate Bill No. 1011, not being effective until 30 June, 1929, does not affect this litigation.

4. That the exceptions of the petitioners to the dismissal of the petition as upon demurrer should have been sustained.

Now, therefore, upon motion of petitioners, the transportation committee above named, it is hereby ordered, adjudged and decreed, as follows:

1. That the exceptions of the petitioners to the dismissal of the petition by the Corporation Commission be, and the same are hereby sustained.

2. That the Corporation Commission has and is entitled to exercise full power and authority to make reasonable rules and regulations governing and regulating the transporting of all passengers on buses, including negroes, and to require that bus operators, operating under

franchises, granted pursuant to chapter 136, Public Laws of 1927, and other pertinent statutes, provide equal, but separate, accommodations for white and negro passengers.

3. That this cause is hereby remanded to the Corporation Commission for further proceedings upon said petition and for further orders pursuant to this decree.

The court being of the opinion that the right of the members of each race to travel on buses operated under such franchises for the transportation of passengers for hire is available after a reasonable time, within which the Corporation Commission may work out the details and put into force reasonable regulations and rules requiring and insuring separate accommodations for the races.

Now, therefore, it is further ordered, adjudged and decreed: That such rules and regulations have been so provided and so promulgated by the Corporation Commission within a reasonable time after the final judgment herein, the respondents, the bus operators, are not required to transport negro passengers, but they are required to transport negro passengers immediately after the entering and promulgating of such rules and regulations as aforesaid."

*I. M. Bailey for plaintiff.*
*Varser, Lawrence, Proctor & McIntyre for defendant.*

CLARKSON, J. The petition of the Transportation Committee of the North Carolina Commission of Interracial Coöperation, among other things, says: "That the petitioners are citizens and residents and taxpayers of the State of North Carolina, and organized and interested in, among other purposes, promoting the best interest of the white and negro races in North Carolina and their relations to each other, and as one of the means of accomplishing this purpose, they are endeavoring to secure for the use and enjoyment of the negro traveling public such transportation privileges and the enjoyment of such transportation rights as belong to them as citizens of North Carolina, in such a manner as to promote and to insure the welfare of all races. That the respondents named above are motor-vehicle carriers of passengers for hire over the State highway system of public roads, pursuant to certificates granted by the Corporation Commission of the State of North Carolina. . . . Wherefore your petitioners pray that notice of this petition be given to the respondents and that a hearing be had, and that the Commission enter such rules and regulations as will insure to the negro traveling public the said separate accommodations on said buses, as well as separate accommodations in the union and individual bus passenger stations, and in such other matters and details as may appear reasonable and necessary to this Commission, and that such orders be entered as will

promote the enforcement of said rules and regulations and the enjoyment of the rights to travel separately on said buses, as aforesaid."

It is contended by defendant "That separate accommodations can be provided for the negro race in such bus travel without placing any unjust or unbearable burden upon the bus carriers, and that in buses, and in the rear thereof, a simple and inexpensive partition wall of transparent material, movable and adjustable, can be used so that the races may be separated in each bus, or that in emergency separate buses can be operated, in that the traveling public is ready and willing to accommodate itself to the use of such separate accommodations. It further appears that just as practical separate accommodations for the races on bus travel can be provided as on railroads and steamboats."

It has long been the settled policy of this State, promulgated through the legislative branch of the government, to have separation or segregation of the white and negro races with equal accommodations, in the public institutions of the State, and by public service corporations. Separate schools for the white race and negro race; separate asylums and other institutions for the afflicted negroes in the State, separate reformatories, etc. In the cities and towns that have them, separate parks, separate libraries, etc. By public service corporations, separation and segregation on railroad trains, steamboats, street cars, separation and segregation in the railroad and steamboat companies' passenger stations. *S. v. Williams*, 186 N. C., 627.

In recent years, since the constructive policy of hard-surfaced and dependable roads in the State, the bus line has become one of the most important carriers of passengers. We think the Corporation Commission has full and plenary power, under the present law, to see to it that the bus lines provide separate accommodations for white and negro passengers, and separate bus station facilities. This matter is left largely to the discretion of the Corporation Commission as to the manner and method. As to separate apartments in the buses or separate buses run for the accommodation of the white and negro races, this is a matter for the Corporation Commission to determine, taking into consideration the terminals of the lines, population, economical conditions. The matter should be worked out in good faith by the Corporation Commission, taking all things into consideration, for the best welfare of the white and negro races, so that justice can be accomplished in this racial condition that exists among us—a duty that the State owes to all of its citizens. Chapter 136, Public Laws 1927, especially section 7 of said act.

Chapter 216, Public Laws 1929, amending C. S., 3494 and 3497, and section 7, chapter 136, Public Laws 1927, which went into effect 30 June, 1929, the act "Relative to separation of the races in transportation by motor vehicle." We think this act also authorizes the Cor-

poration Commission to work out in good faith the manner and method left to the sound discretion of the Commission—a sane and sensible solution giving adequate and equal accommodation to the white and negro races, taking into consideration all matters including economical conditions relative to a workable solution.

It goes without saying that hotels, innkeepers, theatres, and the like are not engaged in public or quasi-public business and have not been subject to such regulations as herein set forth as are applicable to the public institutions of the State and public service corporations. *S. v. Steele,* 106 N. C., 766; *Money v. Hotel Co.,* 174 N. C., 508.

In *Pickett v. Kuchan,* 49 A. L. R. (Ill.), p. 499, in annotation on p. 511, we find the following: "And it has been stated that any law 'which would impose upon the white race the imperative obligation of mingling with the colored race on terms of social equality would be repulsive to natural feeling and long-established prejudices, and would be justly odious.' Civil Rights Bill (1875) 1 Hughes, 541, 2d ed., Cas. No. 18258. And it has been stated that it is doubtful, to say the least, if socalled Civil Rights Statute could be made to apply to purely private business. *Brown v. J. H. Bell Co.,* 27 L. R. A. 407 (Iowa)."

The Congress of the United States, on 1 March, 1875, passed "An act to protect all citizens in their civil and legal rights." 18 Stat., 335. The law passed by Congress: "Section 1. That all persons within the jurisdiction of the United States shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities and privileges of inns, public conveyances on land or water, theatres, and other places of public amusement; subject only to the conditions and limitations established by law, and applicable alike to citizens of every race and color, regardless of any previous condition of servitude." Section 2 made any violation of the above section a misdemeanor and upon conviction a fine of not less than $500 nor more than $1,000 or imprisonment of not less than 30 days nor more than a year, and provided a penalty of $500 to the person aggrieved.

Under this act certain persons were convicted, and from the judgments rendered appeals were taken to the Supreme Court of the United States to test the constitutionality of the act. They are known as the Civil Rights Cases, and reported in the 109 U. S., p. 3. At p. 4 the facts: "Two of the cases, those against Stanley and Nichols, were indictments for denying to persons of color the accommodations and privileges of an inn or hotel; two of them, those against Ryan and Singleton, were, one on information, the other an indictment, for denying to individuals the privileges and accommodations of a theatre, the information against Ryan being for refusing a colored person a seat in the dress circle of Maguire's theatre in San Francisco; and the indictment against Single-

ton was for denying to another person, whose color was not stated, the full enjoyment of the accommodations of the theatre known as the Grand Opera House in New York, 'said denial not being made for any reasons by law applicable to citizens of every race and color, and regardless of any previous condition of servitude.' " The Court held: The first and second sections of the Civil Rights Act passed 1 March, 1875, are unconstitutional enactments as applied to the several States, not being authorized either by the Thirteenth and Fourteenth Amendments of the Constitution. The Fourteenth Amendment is prohibitory upon the States only, and the legislation authorized to be adopted by Congress for enforcing it is not *direct* legislation on the matters respecting which the States are prohibited from making or enforcing certain laws, or doing certain acts, but is *corrective* legislation, such as may be necessary or proper for counteracting and redressing the effect of such laws or acts. The act was declared unconstitutional and void, and the defendants acquitted.

In *McCabe v. A. T. & S. R. Ry. Co.*, 235 U. S., at p. 158, it is said: "The Legislature of the State of Oklahoma passed an act, approved 18 December, 1907 (Rev. Laws, Okla., 1910, sec. 860 *et seq.*), known as the 'Separate Coach Law.' It provided that 'every railway company . . . doing business in this State, as a common carrier of passengers for hire' should 'provide separate coaches or compartments, for the accommodation of the white and negro races, which separate coaches or cars' should 'be equal in all points of comfort and convenience' (sec. 1); that at passenger depots there should be maintained 'separate waiting rooms,' likewise with equal facilities (sec. 2); that the term negro, as used in the act, should include every person of African descent, as defined by the State Constitution (sec. 3); and that each compartment of a railway coach 'divided by a good and substantial wooden partition, with a door therein, shall be deemed a separate coach,' within the meaning of the statute (sec. 4). It was further provided that nothing contained in the act should be construed to prevent railway companies 'from hauling sleeping cars, dining or chair cars attached to their trains to be used exclusively by either white or negro passengers, separately but not jointly' (sec. 7). Other sections prescribed penalties both for carrier, and for passengers, failing to observe the law. . . . (p. 160). That it had been decided by this Court, so that the question could no longer be considered an open one, that it was not an infraction of the Fourteenth Amendment for a State to require separate, but equal, accommodations for the two races. *Plessy v. Ferguson,* 163 U. S., 537. That the provision of section 7, above quoted, relating to sleeping cars, dining cars and chair cars did not offend against the Fourteenth Amendment, as these cars were, comparatively speaking, luxuries, and that it was competent for the Legislature to take into consideration the limited

demand for such accommodations by the one race, as compared with the demand on the part of the other. That in determining the validity of the statute the doctrine that an act although 'fair on its face' might be so unequally and oppressively administered by the public authorities as to amount to an unconstitutional discrimination by the State itself *(Yick Wo v. Hopkins,* 118 U. S., 356, 373) was not applicable, as there was no basis in the present case for holding that any discriminations by carriers which were unauthorized by the statute were practiced under State authority. That the act, in the absence of a different construction by the State court, must be construed as applying to transportation exclusively intrastate, and hence did not contravene the commerce clause of the Federal Constitution." *Hall v. DeCuir,* 95 U. S., 547.

It is held in *Lowery v. School Trustees,* 140 N. C., at p. 34, the essential principles underlying the establishment and maintenance of the public school system of this State are: First, the two races must be taught in separate schools, and second, there must be no discrimination for or against either race. Keeping them in view, the matter of administration is left to the Legislature and the various officers, boards, etc., appointed for that purpose. Const. of N. C., Art. IX, sec. 2; C. S., 5537, 5538.

In our State Constitution, Art. XIV, sec. 8, we find: "All marriages between a white person and a negro, or between a white person and a person of negro descent to the third generation inclusive, are hereby forever prohibited." *S. v. Melton,* 44 N. C., 49; *Puitt v. Commissioners,* 94 N. C., 709.

C. S., 4340, is as follows: "All marriages between a white person and a negro, or between a white person and a person of negro descent to the third generation inclusively, are forever prohibited, and shall be void. Any person violating this section shall be guilty of an infamous crime, and shall be punished by imprisonment in the county jail or State's prison for not less than four months or more than ten years, and may also be fined, in the discretion of the court."

Before the Emancipation Proclamation, 1 January, 1863, there was a large element of free negroes in this State and the South. In the Southern States there was a strong anti-slavery sentiment. Leading men manumitted their slaves by will and otherwise. Gen. Robert E. Lee, the Southern Chieftain, was an open abolitionist, and freed his personal slaves long before 1861. An interesting case on this subject is *Johnson v. Clarkson,* 21 S. C. Eq. Reports, p. 305. In that case defendant's brother left his entire estate, valued at $116,500 (this included the value of his negroes) in trust to his brother for the purpose of freeing them. The will was made 2 October, 1840. Among the directions given defendant by his brother was the following: "If the law forbidding the emancipation of slaves in South Carolina is then in

force, so that *all* my negroes must be removed, then the husbands and wives of any of mine belonging to other persons, must be purchased from moneys of my estate not vested in lands, if there is a sufficient amount, but if there is not a sufficient sum, then so much as is necessary in addition, must be taken from the sale of the lands. . . . Husbands and wives must on no account be separated. . . . I wish no evasion of the law practiced, but application to be made to the Legislature to permit it to be executed."

John Lord, of Stamford, Conn., who wrote "Beacon Lights of History," in 1858 visited one of the defendants in the *Johnson case, supra,* and in Vol. 8, at p. 235-6, speaking of his host, says: "He was a wealthy planter and showed how well a benevolent, Christian gentleman could care for two hundred negroes. He had religious services for them on Sunday, at which a brilliant young clergyman officiated. The slaves seemed comfortable and happy, they sang their negro songs with great glee. . . . Christianity had worked on material ready for its reception—on a race naturally religious, affectionate and faithful. It took one thousand years to elevate the Germanic barbarian."

In the *Johnson case, supra,* the great jurist, James L. Pettigrew (Petigru), appeared for the legatees, to sustain the will. His kinsman, the heroic General James Johnston Pettigrew, of this State, made the famous charge with Pickett at Gettysburg on Cemetery Ridge, 3 July, 1863, and was wounded and later gave his life for the cause. In 1852 he became associated in the practice of law with James L. Pettigrew (Petigru) and continued until the breaking out of the War Between the States. *Sic mundi gloria transit.*

We repeat what was said in *S. v. Williams,* 186 N. C., at p. 633-4: "We believe, in this State, that the negro has 'the equal protection of the laws.' In fact, the best friends that the negro has are his white neighbors. The negro has been in many respects a chosen people—brought here, the land of opportunity, among civilized people, without any effort on their part, from Africa. The burden 'imposed, not sought,' has been on the white people of this State to civilize and Christianize them. The trust has been and is being faithfully performed. The race is making great strides. It is a matter of common knowledge that if in a trial of a case before a jury that involves a moneyed transaction between a white man and a negro man, if there is the least evidence that the white man has overreached or cheated a negro, the juries invariably decide for the negro. The best element of the negroes in this State are in full accord with law enforcement and the punishment of the negro who would overstep the bounds of race and be guilty of race or kindred crimes." The judgment below is

Affirmed.