STATE v. ANDREW S. JOHNSON, BAYARD RUSTIN, IGAL ROODENKO
AND JOSEPH A. FELMONT.

(Filed 7 January, 1949.)

**1. Carriers § 18b—**

> G.S. 60-135 and G.S. 60-136 apply not only to transportation of passengers within a city or town but also to transportation of intrastate passengers from one city or town to another. G.S. 60-139.

**2. Same—**

    In a prosecution under G.S. 60-135 and G.S. 60-136, evidence that a white and a colored defendant occupied the same seat on a bus and refused to move to unoccupied seats in the front and rear of the bus as required by statute, makes out a *prima facie* case of intent to violate the statute and is sufficient to withstand defendants' motion for judgment as of nonsuit even in the absence of evidence by the State that defendants were intrastate passengers, since the burden of going forward with the evidence to show that defendants were interstate passengers rests upon defendants as a matter relating to an exemption, immunity, or defense.

**3. Criminal Law § 28—**

    Where a statute creates a substantive criminal offense, the State has the burden of establishing the *corpus delicti*, but the burden of going forward with the evidence to establish an independent, distinct, substantive matter of exemption, immunity or defense, beyond the essentials of the legal definition of the offense itself, rests upon defendant.

APPEAL by defendants from *Morris, J.,* at March Term, 1948, of ORANGE.

The defendants were tried and convicted upon warrants issued in the Recorder's Court of Orange County, charging them with violating G.S. 60-135 and G.S. 60-136, and the ordinances of the City of Chapel Hill. The defendants were adjudged guilty and from the judgments imposed they appealed to the Superior Court, where the cases were consolidated and tried together on the original warrants.

The evidence offered below tends to show the following facts:

On Sunday, 13 April, 1947, the defendants, Andrew S. Johnson, Bayard Rustin, Igal Roodenko and Joseph A. Felmont, the first two being colored men and the latter two white men, boarded one of the busses of the Carolina Coach Company in Chapel Hill, N. C. The bus was in charge of Ned Leonard, the driver, and was being operated on a regularly scheduled run from Raleigh to Charlotte via Chapel Hill and Greensboro.

The bus was equipped to accommodate thirty-seven passengers in addition to the driver. After these defendants entered the bus there were twenty-six passengers, four of whom were colored persons. Andrew S. Johnson and Joseph A. Felmont sat down in the third seat from the front of the bus, Johnson next to the window and Felmont next to the aisle. Roodenko sat down approximately four seats from the front and Rustin took a seat next to the last one on the first tier of seats from the rear. The rear seat was unoccupied. Only one seat was unoccupied in front of the seat occupied by Johnson and Felmont. White persons occupied a number of seats behind the colored man, Andrew S. Johnson.

The bus driver, Ned Leonard, requested Johnson to change his seat to a rear one and quoted to him the rules of the company with respect to

the seating of white and colored passengers. He refused to move. The bus driver also asked the defendant Felmont to change his seat, which he refused to do. He said he would not move unless he was under arrest.

A police officer of the City of Chapel Hill was called. The defendants Johnson and Felmont were again asked to change their seats, as required by the rules of the company, and they refused to do so. The officer thereupon arrested both of the defendants, Johnson and Felmont, and took them from the bus.

When the driver returned to the bus after the arrest had been made of Johnson and Felmont he found that the defendants Rustin and Roodenko had moved up and were sitting together in the same seat which had been occupied by Johnson and Felmont, that is, the third seat from the front of the bus, the colored man sitting next to the window and the white man sitting next to the aisle. The rules of the Company were quoted to them and they were requested by the bus driver to take the proper seats which were designated, but they refused to move.

At this point the driver of the bus asked the defendant Roodenko where he was going and he said he was going to Danville, Virginia. He told him that he was on the wrong bus and that if he would step off, he would fix his ticket to go through Durham, which is proper. He said, "No, I am going to Greensboro." He asked Rustin where he was going and he wouldn't tell him. He offered to fix their tickets for a refund. They would not show him their stubs.

The bus driver thereupon called an officer and had the defendants Roodenko and Rustin arrested. The bus driver testified that the defendant Roodenko never did give him a ticket to Greensboro. He was not sure what ticket he did give him. He did not have in his possession any ticket for Danville.

The bus driver testified he did not know of his own knowledge what the destination of the other defendants was at the time they boarded the bus.

None of the defendants testified as witnesses in the trial below, except Roodenko. He testified that after he was informed he was on the wrong bus, he stated to the driver "I might want to stop in Greensboro on the way over" and "When I explained to the driver that I might want to stop in Greensboro, he agreed I was on the right bus and tore off the first part of the ticket and let me go in."

On cross-examination this defendant testified that he and the other three defendants were traveling together in North Carolina. They had arrived in Chapel Hill in the middle of the afternoon on the day before, having traveled by bus from Raleigh. This witness stated he was not traveling for the purpose of testing the segregation laws of the State but was on a business and pleasure trip. "My purpose on this trip, as in

many other things in my life for many years past, has been to see what I could do in my own small way to promote better understanding among various groups of people. That was the purpose of this trip. On this trip I proposed to attempt to promote better understanding between negroes and whites."

This defendant testified further that after his arrest he went by private car from Chapel Hill to Greensboro, where he attended a meeting. He stated that the other defendants attended some of the meetings that he attended. He knew in advance that there would be a meeting in Greensboro on the night of September 13 (April 13) and he remained in Greensboro until the following day.

This defendant also testified that his expenses on this trip were being paid by the "Fellowship of Reconciliation," and that he was familiar with the instructions issued by this "Fellowship of Reconciliation" and that he was familiar with Memorandum No. 2, issued by them, entitled "Bus and Train Travel in the South," purported to have been issued by George M. Houser and Bayard Rustin.

The jury returned a verdict of guilty and from the judgments imposed, all four defendants appealed to the Supreme Court and assign error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*Herman L. Taylor and C. J. Gates for defendants.*

DENNY, J. The defendants assign as error the refusal of the Court below to grant their motion to quash the warrants on the ground that the State has indicted them under inapplicable sections of the General Statutes.

The defendants contend that it was the intent of the Legislature to vest in the Utilities Commission, under Sections 62-109 and 62-118 of the General Statutes, the power to prescribe the rules and regulations with respect to the seating of passengers on public conveyances except in busses engaged in local transportation, within cities and towns in the State. Consequently it is contended that Sections 60-135 and 60-136 of the General Statutes do not apply to motor vehicles transporting passengers for hire except on busses used in transporting passengers within a city or town.

The contention is without merit. The provisions of Sections 3536 to 3539 of the N. C. Code, 1939 (now Sections 60-135 to 60-138, G.S. of N.C.), were extended by Chapter 489 of the Public Laws of 1933, G.S. 60-139, to include "motor busses operated in the urban, interurban or suburban transportation of passengers for hire, and to the operator or operators thereof, and the agents, servants, and employees of such operators."

Moreover, Section 62-109 of the General Statutes of North Carolina deals with the mandatory duty of the Utilities Commission to "require any motor vehicle carrier operating on a franchise granted by the Utilities Commission . . . if engaged in the transportation of both white and colored passengers for hire, to provide separate but equal accommodations for the white and colored races at passenger stations or waiting rooms where the carrier receives passengers of both races and/or on all busses or motor vehicles operating on a route or routes over which such carrier transports passengers of both races." While Section 62-118 prescribes the penalty which may be imposed upon those who willfully violate or fail to comply with "any order, decision, rule or regulation, direction or requirement of the Commission, made under the provisions of this article." (Being Art. 6, Chap. 62, G.S. 62-103 to 62-121 inclusive.) These statutes do not purport to deal with the enforcement of segregation, but to make it mandatory on the part of the Utilities Commission to require transportation companies to provide "equal accommodations for the white and colored races," in order that the settled policy of this State, which calls for the segregation of the white and colored races, in the public institutions of the State, and on our intrastate transportation systems, may be enforced. *Corporation Commission v. Interracial Com.,* 198 N. C. 317, 151 S. E. 648; *S. v. Harris,* 213 N. C. 758, 197 S. E. 594.

This assignment of error will not be upheld.

G.S. 60-135 requires railroads and other carriers in this State engaged in the transportation of passengers for hire, to provide separate accommodations for white and colored passengers. Section 60-136 provides the manner in which the provisions of G.S. 60-135 shall be carried out, and the pertinent parts thereof read as follows: "Any white person entering a street car or other passenger vehicle or motor bus for the purpose of becoming a passenger therein shall . . . occupy the first vacant seat or unoccupied space nearest the front thereof, and any colored person entering a street car or other passenger vehicle or motor bus for a like purpose shall occupy the first vacant seat or unoccupied space nearest the rear end thereof, provided, however, that no contiguous seat on the same bench shall be occupied by white and colored passengers at the same time, unless and until all the other seats in the car have been occupied. Upon request of the person in charge of the street car or other passenger vehicle or motor bus, and when necessary in order to carry out the purpose of providing separate seats for white and colored passengers, it shall be the duty of any white person to move to any unoccupied seat toward or in the front of the car, vehicle or bus, and the duty of any colored person to move to any unoccupied seat toward or in the rear thereof, and the failure of any such person to so move shall constitute *prima facie* evidence of an intent to violate this section. Any person violating the provisions of this

section shall be guilty of a misdemeanor, and, upon conviction, shall be fined not more than fifty dollars or imprisoned not exceeding thirty days. Any such person may also be ejected from the car, vehicle or bus by the person charged with the operation thereof."

The evidence adduced in the trial below was sufficient to withstand the defendants' motion for judgment as of nonsuit.

The white and colored defendants having occupied the same seat on the bus, in violation of the statute, and having refused to move to the unoccupied seats, in the front and rear of the bus, as required by the statute and the rules of the carrier, this made out a *prima facie* case of intent to violate the statute, and the burden of going forward with proof, not the burden of proof, shifted to the defendants. *S. v. Brown,* 225 N. C. 22, 33 S. E. (2) 121.

In *S. v. Davis,* 214 N. C. 787, 1 S. E. (2) 104, the defendant contended among other things that it was the duty of the State to negative by proof the possibility that the truck load of whiskey which had been seized in this State, was in process of movement in interstate commerce. *Barnhill, J.,* in speaking for this Court, said : "It is sufficient answer to these contentions to point out that it has long been settled in this State that although the burden of establishing the *corpus delicti* is upon the State, when defendant relies upon some independent, distinct, substantive matter of exemption, immunity or defense, beyond the essentials of the legal definition of the offense itself, the *onus* of proof as to such matter is upon the defendant. *S. v. Arnold,* 35 N. C. 184; *S. v. McNair,* 93 N. C. 628; *S. v. Buchanan,* 130 N. C. 660; *S. v. Smith,* 157 N. C. 578. In discussing this phase of the law in *S. v. Connor,* 142 N. C. 700, *Hoke, J.,* says: 'It is well established that when a statute creates a substantive criminal offense, the description of the same being complete and definite, and by a subsequent clause, either in the same or some other section, or by another statute, a certain case or class of cases is withdrawn or excepted from its provisions, these excepted cases need not be negatived in the indictment, nor is proof required to be made in the first instance on the part of the prosecution. . . . In such circumstances, a defendant charged with the crime who seeks protection by reason of the exception, has the burden of proving that he comes within the same. *S. v. Heaton,* 81 N. C. 543; *S. v. Goulden,* 134 N. C. 743. To the same effect are *S. v. Norman,* 13 N. C. 222; *S. v. Burton,* 138 N. C. 576; and *S. v. Johnson,* 188 N. C. 591; *S. v. Dowell,* 195 N. C. 523; *S. v. Hege,* 194 N. C. 526; *S. v. Foster,* 185 N. C. 674.' "

Even so, it appears on this record, that the court instructed the jury that if upon the evidence in this case the State "has failed to satisfy you beyond a reasonable doubt that the defendants were intrastate passengers, then you will return a verdict of not guilty, because if the State has

failed to satisfy you beyond a reasonable doubt that the defendants were intrastate passengers, then of necessity they would be interstate passengers and as the Court understands the law to be, if they were interstate passengers they would not be guilty of any violation of the law." This placed a greater burden upon the State than it was required to carry.

The case of *Morgan v. Virginia,* 328 U. S. 373, 90 L. Ed. 1317, relied upon by the defendants, is not applicable to intrastate passengers. *Cf. Pridgen v. Coach Co., ante,* 46, 47 S. E. (2) 609.

We have carefully considered all the exceptions and assignments of error brought forward by the defendants, and they present no prejudicial error. The verdicts and judgments entered below will be upheld.

No error.