STATE OF NORTH CAROLINA v. ROBERT TRIMBLE

No. 7929SC482

(Filed 5 Feburary 1980)

1. Poisons § 1— putting poisonous foodstuffs in public places—exception for insects and rats—burden of proof

The insect control and rat extermination exception in G.S. 14-401, which prohibits the placing of poisonous foodstuffs in certain public places, is neither an element of the crime nor an affirmative defense thereto but is instead a "hybrid" factor in determining criminal liability; the State has no initial burden of producing evidence to show that defendant's actions do not fall within the exception; however, once the defendant, in a non-frivolous manner, puts forth evidence to show that his conduct is within this exception, the burden of persuading the trier of fact that the exception does not apply falls upon the State.

2. **Indictment and Warrant § 9.4— statutory offense—exception—necessity for allegation**

An indictment or warrant for an arrest need not set forth a charge that defendant's conduct is not within an exception to the statute under which he is charged.

3. **Poisons § 1— putting poisonous foodstuffs in public place—exception for insects or rats—burden of proof**

In a prosecution of defendant for unlawfully placing poisonous foodstuffs in his yard and thereby causing death or injury to his neighbor's dogs, the trial court properly placed the entire burden of proof on the State to show that defendant placed the poison food out for "purposes other than poisoning insects or worms for the production of crops, plants or trees or for the extermination of rats," and defendant therefore was not prejudiced by the omission in the indictment of a statement that he did not place the poison out for insect control or rat extermination.

4. **Poisons § 1— putting poisonous foodstuffs in public places—food on concrete patio—parathion—constitutionality of statute**

G.S. 14-401 prohibiting the placing of poisonous foodstuffs in a public place is not unconstitutionally vague, since the General Assembly intended to prohibit putting poison outside virtually everywhere an innocent child or animal could find it, and defendant's concrete patio came within the prohibition of the statute; furthermore, though parathion is a poison used in rat extermination, it nevertheless comes within the prohibition of the statute if it is put out for purposes other than rat extermination.

5. **Criminal Law § 34.7— poisoning dogs—evidence that other dogs were killed—admissibility**

In a prosecution of defendant for unlawfully placing poisonous foodstuffs in a public place thereby causing injury and death to a neighbor's dogs, evidence concerning the death of two other dogs belonging to neighbors was admissible to show the *corpus delecti* of the crime, particularly for showing that the poison was put out for purposes other than rat extermination, and the evidence was also admissible to show intent, motive, and plan or design on the part of defendant to eliminate the problem of visitations by his neighbor's dogs.

6. **Criminal Law § 75.9— volunteered incriminating statement**

In a prosecution of defendant for placing poisonous foodstuffs in a public place thereby causing injury or death to a neighbor's dogs, defendant's statement to a police officer, "If your neighbor's dogs come up and [defecated] all over your wife's flowers, what would you do?" was properly admitted into evidence as a voluntary and uncoerced statement made freely without any compelling influences, where the evidence tended to show that defendant was under arrest at the time that he made the statement, but defendant made the statement in response to no question or comment by the arresting officer.

State v. Trimble

7. **Searches and Seizures § 33—** pie pan in plain view on patio—warrantless seizure proper

   In a prosecution of defendant for placing poisonous foodstuffs in a public place thereby causing injury or death to a neighbor's dogs, the trial court properly admitted into evidence a pie pan found on defendant's patio, its contents and evidence relating to a chemical analysis thereof, since defendant admitted placing the pan on the patio; an officer discovered the pan which was in plain view when he was knocking on the back door of defendant's house; the officer went to defendant's premises armed with a valid warrant for defendant's arrest; and it was entirely reasonable for the officer to conclude that contents of the pan could be the poisonous foodstuffs described in the warrant.

APPEAL by defendant from *Ferrell, Judge.* Judgment entered 15 February 1979 in Superior Court, HENDERSON County. Heard in the Court of Appeals 27 September 1979.

On 13 October 1979, defendant Robert Trimble was arrested by law enforcement officer George Kent for violation of N.C. Gen. Stat. § 14-401 by "unlawfully, willfully, [placing] poisonous compounds on beef and other foodstuffs on his yard in the country [with] [s]aid poinsonous [sic] foodstuffs causing death and or injury to the dogs belonging to Renee Winton."

SUMMARY OF STATE'S EVIDENCE

On 13 October 1978 Renee and Danny Winton owned three Irish setter puppies which were nine weeks old, approximately ten inches tall, vaccinated, in good health and without any visible wounds. The Winton's house was located in the woods behind defendant's house. At about 7:30 on that morning Renee Winton walked out her front door and looked around for the puppies because they usually stayed on the porch. She saw the puppies in defendant's yard by his garbage cans, called the puppies back into her yard and went in the house to help one of her children. When she returned, she found that the puppies had gone back to the area by defendant's garbage cans. At this time Renee Winton again called the puppies and took them with her into the house. Approximately fifteen minutes later the female puppy started wobbling around, released her bowels, and went into convulsions. Shortly thereafter, the other two puppies became sick. One of them vomited and lived but the other two puppies died.

Renee Winton then took the puppies to Dr. Justice, a veterinarian. Shortly thereafter Danny Winton took the two dead puppies to the North Carolina Department of Agriculture Western Animal Disease Diagnostic Laboratory where they were examined by Dr. Edwin A. Holsinger, a veterinary pathologist who was Director of the laboratory. Dr. Holsinger suspected insecticide poisoning and sent stomach contents to the Raleigh laboratory for further testing.

On 13 October 1978, Officer Jim Goodwin of the Henderson County Sheriff's Department, went to the defendant's home with the warrant of arrest for the crime charged in the present case. Officer Goodwin knocked on defendant's front door, got no response, then knocked on defendant's back door, and similarly got no response. At this time, Officer Goodwin noticed an aluminum pie pan located next to the garbage cans and containing what looked like sausage and biscuits. Officer Goodwin picked up the pie pan, placed it in a plastic bag and put it in the trunk of his car to take it to the diagnostic lab.

Renee Winton went back home and later heard defendant slam his car door when he returned to his house. Renee Winton then watched defendant walk directly to the garbage cans in the back of his house, bend over and look around. Defendant did not open the garbage cans.

Shortly thereafter Officer Goodwin returned to defendant's residence and found defendant home. Officer Kent, who was accompanying Officer Goodwin, read the warrant to defendant and gave defendant a copy of the warrant. The defendant went back into his house to get his coat and the officers returned to their car. When defendant came out of the house the officers told him that he could drive his truck in, that the Magistrate would set his bond, and that very possibly he could come back home. At this point in time, defendant was under arrest but had not been advised of his *Miranda* rights. Defendant then made the following statement to the officers:

"Let me ask you this. If your neighbors' dogs come up and [defecated] all over your wife's flowers, what would you do?"

The testimony of Dr. Edwin Holsinger and Robert Smith, an analytic chemist and toxicologist with the North Carolina Depart-

ment of Agriculture at the Rollins Animal Disease Diagnostic Laboratory, indicated that the stomach contents and the hamburger compound taken from the pie pan contained the toxic insecticide parathion and that the parathion caused the death of two of the puppies.

On 13 October 1978 a cocker spaniel owned by Tommie Hyer, defendant's next door neighbor, also died of parathion poisoning.

In the spring prior to 13 October 1978 defendant shot and buried another Irish setter owned by the Wintons. This incident followed a call from the Humane Society to the Wintons indicating that the Winton's dog had barked at defendant's brother-in-law.

## SUMMARY OF DEFENDANT'S EVIDENCE

Defendant testified that in the spring of 1978 he saw some large rats 12 to 14 inches long on his property; that he thought that rats were coming onto his property from an open septic tank next to the Mitchem home; that he had made a complaint about the septic tank to Mary Frances Dixon at the Environmental Health Section of the Henderson County Health Department; that the aforesaid complaint discusses the open septic tank and terrible odors but does not mention any problem with rats; that between the spring and fall of 1978 he placed parathion out; and that he had succeeded in killing one rat with the poison during this earlier period.

Defendant also testified that at about 7:30 a.m. on a Saturday morning in the spring of 1978, his wife's uncle came to defendant's front door and was yelling "real loud." Defendant saw that Mrs. Winton's Irish setter had Mr. Owenby backed up against the front door. Mr. Owenby stated, "That dog is going to bite me." Defendant thereafter called the dogcatcher who purportedly told defendant that he had a right to kill the dog. Later that afternoon, while defendant, his wife, and his daughter were sitting at the dining room table eating, the Irish setter came into defendant's yard again and growled. Defendant got out his rifle and shot the dog.

*Attorney General Edmisten by Special Deputy Attorney General John R. B. Matthis and Assistant Attorney General Rebecca R. Bevacqua for the State.*

*Prince, Youngblood, Massagee and Creekman by James E. Creekman for defendant appellant.*

CLARK, Judge.

## I. *Elements of the Offense*

Appellant was convicted under N.C. Gen. Stat. § 14-401, which statute provides as follows:

> "§ 14-401. *Putting poisonous foodstuffs, etc., in certain public places, prohibited*—It shall be unlawful for any person, firm or corporation to put or place any strychnine, other poisonous compounds or ground glass on any beef or other foodstuffs of any kind in any public square, street, lane, alley or on any lot in any village, town or city or on any public road, open field, woods or yard in the country. Any person, firm or corporation who violates the provisions of this section shall be liable in damages to the person injured thereby and also shall be guilty of a misdemeanor, and upon conviction shall be fined or imprisoned, at the discretion of the court. *This section shall not apply to the poisoning of insects or worms for the purpose of protecting crops or gardens by spraying plants, crops or trees nor to poisons used in rat extermination.*" (Emphasis supplied.)

Appellant argues that the above-underlined exception for rat extermination and insect control constitutes an element of the offense which is not set forth in the arrest warrant as required by N.C. Gen. Stat. § 15A-924(a)(5), and that therefore the charges must be dismissed pursuant to N.C. Gen. Stat. § 15A-924(e) and § 15A-954(a)(10).

We are hesitant to define an exception in a statutory definition of a crime as an element of that crime. Appellant's seemingly simple contention is replete with subtle but significant procedural due process questions left unresolved by the United States Supreme Court in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed. 2d 368 (1970); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct.

1881, 44 L.Ed. 2d 508 (1975); and *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed. 2d 281 (1977), concerning the proper interrelationships between the definition of a crime, defenses thereto, the respective burdens of proof and ultimate criminal liability.[1]

Our concern is that a purely formalistic or procedural approach to defining elements and assigning burdens of proof ($\underline{X}$ is an element of the crime therefore $\underline{S}$ has the burden of proof) may disregard federal and state due process and law of the land, respectively, limitations on substantive criminal law, such as that enunciated in *In re Winship, supra*, that the accused is protected "against conviction except upon proof beyond reasonable doubt of *every fact necessary* to constitute the crime with which he is charged." 397 U.S. at 364 (emphasis supplied). In essence, following a purely formalistic approach would allow the General Assembly "to shift, virtually at will, the burden of persuasion with respect to any factor in a criminal case, so long as it is careful not to mention the nonexistence of that factor in the statutory language that defines the crime." *Patterson v. New York*, 432 U.S. at 223 (Powell, J., dissenting).[2]

In the instant case we are not troubled by the possibility that the General Assembly, in enacting N.C. Gen. Stat. § 14-401 has gone beyond the constitutional limits established by *In re Winship, supra*, and we recognize that legislatures do have con-

---

1. *See generally,* Jeffries and Stephens, *Defenses, Presumptions and Burdens of Proof in the Criminal Law,* 88 Yale L.J. 1325 (1979); Eule, *The Presumption of Sanity; Bursting the Bubble,* 25 U.C.L.A. L. Rev. 637 (1978); Allen, *The Restoration of In re Winship; A Comment on Burdens of Persuasion in Criminal Cases After Patterson v. New York,* 76 Mich. L. Rev. 30 (1977); Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases,* 86 Yale L.J. 1299 (1977); Ashford & Risinger, *Presumptions, and Due Process in Criminal Cases: A Theoretical Overview,* 79 Yale L.J. 165 (1969); Osenbaugh, *The Constitutionality of Affirmative Defenses to Criminal Charges,* 29 Ark. L. Rev. 429 (1976); Tushnet, *Constitutional Limitations of Substantive Criminal Law: An Examination of the Meaning of Mullaney v. Wilbur,* 55 B.U. L. Rev. 775 (1975).

2. Generally speaking, the State carries both the burden of production and the burden of persuasion as to every element of an offense, and, similarly, the defendant carries both the burden of production and the burden of persuasion as to each affirmative defense. Upon close analysis, however, the distinction between the element and the defense blurs, for it is together that the elements and defenses define the substantive parameters of criminal liability. When one thinks in terms of circumscribing the parameters of criminal liability, disregarding for the moment the allocation of the burden of proof, there is little difference between requiring the State to show that an individual's actions are within the circumscribed area, and requiring the defendant to show that his actions are without the circumscribed area: in either case the prohibited range of conduct is the same.

The procedural implications with respect to the burden of proof are, however, quite serious. As Mr. Justice Powell, in his dissent in *Patterson, supra,* explains: "For example, a state statute could pass muster . . . if it defined murder as mere physical contact between the defendant and the victim leading to the victim's death, but then set up an affirmative defense leaving it to the defendant to prove that he acted without culpable mens rea. The State, in other words, could be relieved altogether of responsibility for proving *anything* regarding the defendant's state of mind, provided only that the face of the statute meets the Court's drafting formulas." 432 U.S. at 224, fn. 8.

siderable latitude in defining elements of a crime and in specifying defenses to that crime, *Patterson, supra,* 432 U.S. at 210; rather, our attention is directed to our concern that we do not artificially analyze the problem and thereby set a precedent for future cases where the General Assembly might define a crime in such way as to place an egregious burden of proof on the defendant. Equally important, we find that where, as in the instant case, the General Assembly has left open the question of whether a factor is to be an element of the crime or a defense thereto, it is more substantively reasonable to ask what would be a "fair" allocation of the burden of proof, in light of due process and practical considerations, and then assign as "elements" and "defenses" accordingly, rather than to mechanically hold that a criminal liability factor is an element without regard to the implications in respect to the burden of proof.

[1]   In light of these considerations we hold that the insect control and rat extermination exception in N.C. Gen. Stat. § 14-401 is neither an element of the crime nor an affirmative defense thereto but is instead a "hybrid" factor in determining criminal liability: the State has no initial burden of producing evidence to show that defendant's actions do not fall within the exception; however, once the defendant, in a non-frivolous manner, puts forth evidence to show that his conduct is within this exception, the burden of persuading the trier of fact that the exception does not apply falls upon the State. In sum, we are not convinced that the exception is a sufficiently "independent, distinct substantive matter of exemption, immunity or defense, beyond the essentials of the legal definition of the offense itself," *State v. Johnson,* 229 N.C. 701, 706, 51 S.E. 2d 186 (1949), to put all the "onus" of proof on the defendant, *id.; State v. Connor,* 142 N.C. (Biggs) 700, 704-05, 55 S.E. 787 (1906).

[2]   With respect to the precise question before us, it follows from this reasoning that an indictment or warrant for an arrest need not set forth a charge that defendant's conduct is not within the exception to the statute. *State v. Johnson, supra.*

[3]   We note that in the case *sub judice,* the trial court placed the entire burden of proof on the State to show that the defendant placed the poison food out for "purposes other than poisoning insects or worms for the production of crops, plants or trees or for

the extermination of rats." This charge is entirely consistent with this opinion. We see no actual prejudice to defendant by the omission of a "not within the exception" statement in the indictment, even if such a statement were required, since the warrant sufficiently apprised defendant of the crime for which he was charged, N.C. Gen. Stat. § 15A-924(a)(5), and the State carried the entire burden of proof on the exception.

## II. *Vagueness*

[4]   We find no merit in defendant's contention that the N.C. Gen. Stat. § 14-401 is unconstitutionally vague. We also hold that the language, "in any public square, street, lane, alley, or on any lot in any village, town or city or on any public road, open field, woods or yard in the country" was sufficiently broad to indicate that the General Assembly prohibited putting poison outside virtually everywhere where an innocent child or animal could find it, and that defendant's concrete patio comes within this definition. Similarly, we agree with the State that while parathion is a poison used in rat extermination, if it is put out for purposes other than rat extermination it comes within the scope of the statutory prohibition.

## III. *Evidentiary Issues*

[5]   The trial court properly admitted testimony pertaining to the Hyer dog and the death of Mrs. Winton's Irish setter. Each of these evidentiary items would not be admissible for the purpose of showing that defendant acted in conformity with other crimes but would be admissible to establish the *corpus delecti* of the crime, particularly for showing that the poison was put out for purposes other than rat extermination. Similarly, the evidence was properly admissible to show intent, motive, and plan or design on the part of defendant to eliminate the problem of visitations by his neighbor's dogs. *See* 1 Stansbury's North Carolina Evidence § 92 (Brandis rev. 1973).

[6]   The statement of the defendant to Lieutenant Goodwin ("If your neighbor's dogs come up and [defecated] all over your wife's flowers, what would you do?") was also properly admitted into evidence as a voluntary and uncoerced statement made freely without any compelling influences and therefore falls without the protections of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), and its progeny.

[7]   Also, the trial court properly admitted the pie pan, its contents and evidence relating to the chemical analysis thereof into evidence. First, the defendant admitted placing the pan out on the concrete patio. Second, Officer Goodwin discovered the pan which was in "plain view" when he was knocking on the back door of defendant's house. In the present case the officer went to defendant's premises armed with a valid warrant for the defendant's arrest. The warrant charged the defendant with placing poisonous compounds on beef and other foodstuffs in his yard in the country. It was entirely reasonable for the officer to conclude that contents of the pan could be the poisonous foodstuffs described in the warrant. As the Fourth Amendment only protects individuals from unreasonable searches and seizures, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968), we find no violation of defendant's Fourth Amendment rights.

No error.

Judges HEDRICK and MARTIN (Harry C.) concur.