The prisoner was indicted for the murder of Oliver Layden, and was convicted of murder in the second degree. The testimony tended conclusively to show that the defendant had committed the murder. Oliver Layden left his home at 4 o'clock on the morning of 11 July, 1912, stating to his mother that he was going to Elizabeth City to have his watch mended, and never returned to his home. He was seen (536) several times in Elizabeth City and at other places that day, in company with the defendant. They were riding together on bicycles, which were, on the same day, left at Cartwright's shop. The prisoner disappeared, and as he had been the last one seen with the deceased, several persons went to Norfolk in search of him. He was found at the home of his brother, Ebe Vann, in Berkley, a town in *Page 443 
Virginia near the city of Norfolk. When questioned as to the whereabouts of Oliver Layden, he seemed embarrassed, and he and his brother acted in a very suspicious manner. The prisoner ran from the house, jumped over a fence and attempted to escape. He was overtaken and arrested, but before his arrest, being asked where he had left Oliver, he stated, at first, that he had been with him at his brother's house in Berkley, but was not satisfied there, and had gone with him to Norfolk, though he would not say where he was in Norfolk. He afterwards said that he was not in Norfolk, but in Brooklyn, at 22 Catherine Street, and when further questioned, he said that he had left him in New York at the station; that Oliver had $11 and told him that he would not stop until he had crossed the ocean. The last of July or the first of August a dead human body was found about 4 miles from Elizabeth City, in a dense thicket, at a place called the "Desert," and also the clothing and picture of deceased, and other articles identified as his. A pistol of 38 caliber was also found with two empty chambers, and there were two holes made by the pistol shots in the coat and underclothing. The pistol belonged to the prisoner, and was found in the bushes nearby. The appearance of the place indicated that the body had been dragged from the railroad track to the place where it was lying concealed from the view of passers-by. The coat had been scorched by the fire from the pistol, showing that the person who killed the deceased was very close to him when he shot. There were facts and circumstances in evidence which tended to connect the prisoner with the homicide, but not necessary to be stated. He testified in his own behalf and admitted that he killed Layden, and that he acted in self-defense; Layden, after a quarrel between them, having advanced on him with a drawn knife, which put him in fear of his life, and that he shot and killed Layden believing, at the time, that his (537) life was in peril. He admitted having fled to Norfolk and then to New York by way of Cape Charles, but said he was badly frightened, and left on that account. He further stated that he dragged the body to the place where it was found and threw the bicycle, pistol, and knife in the bushes because he was "scared," and did not know what he was doing; and he gave the same reason for making the conflicting statements to the Laydens and the sheriff at Berkley about the matter Mrs. Layden, mother of the deceased, testified that Oliver never carried a knife, except a small pocket-knife, which she found in his pocket after he had gone.
There was a judgment upon the verdict, from which the prisoner appealed, after duly excepting to certain rulings of the court, set out in the opinion. *Page 444 
The prisoner's first exception relates to the exclusion of W. E. Hinton as a juror from the panel. It appears in the case that Hinton, one of the special venire, was passed by the State and accepted by the prisoner. He then voluntarily stated to the court that he was opposed to capital punishment, and that he would not agree to a verdict of guilty even if the evidence, under the court's instruction, should satisfy him beyond a reasonable doubt of the prisoner's guilt. The court, in the exercise of its discretion, permitted the State to challenge the juror, and upon said challenge, it being found that he was not indifferent or qualified to serve as a juror, the court sustained the challenge and he was excused. We do not perceive any error in this ruling. The precise question was raised in S. v.Boon, 80 N.C. 461. In that case, one of the jurors was called and passed without a challenge to the prisoner, who accepted him. When he was about to be sworn as a juror, he stated to the court that he was related to the deceased and the prisoner. At his own request, the court (538) directed him to stand aside and declined to have him sworn as one of the jurors. The exception of the prisoner to this ruling was overruled. A similar decision was made in S. v. Adair, 66 N.C. 298, where twelve of the venire had been tendered and accepted by the prisoner, and duly sworn as jurors, but before they were impaneled it was found that one of the jurors was related to two of the prisoners, which fact was not known to counsel or the court when the juror was sworn. He was discharged, and the ruling was sustained by this Court on appeal, Pearson, C. J., saying that, "as the jury was not impaneled and charged with the case, it was within the discretion of the court to allow the solicitor the benefit of a challenge for cause, so as to secure a jury indifferent as between the State and the prisoner." This rule of practice is well settled by the authorities. S. v. Jones, 80 N.C. 415;S. v. Cunningham, 72 N.C. 469; S. v. Green,95 N.C. 614; S. v. Ward, 39 Ves., 225. The rule really goes beyond this, for it is the right and duty of the court to see that a competent, fair, and impartial jury are impaneled, subject to the right of peremptory challenge by the prisoner; and in the discharge of this duty, it may stand aside a juror at any time before the jury are impaneled and charged with the case. S. v. Jones, supra; S. v. Boon, supra, and cases therein cited. The court, therefore, may act of its own motion, in furtherance of justice, and need not wait for a formal challenge, if a juror appears to *Page 445 
be disqualified. Any other practice would be subversive of fair and impartial trials, and we do not understand the learned counsel of the prisoner to insist strenuously upon this exception. It may be added, that it does not appear that the prisoner had exhausted his peremptory challenges. His right to challenge is not one to select, but to reject, a juror, and, as was said in S. v. Cunningham, supra, "he obtained a jury of his own selection, and in no point of view was he prejudiced by the action of the court." Thompson on Trials (1889), sec. 120. He had no vested right to a particular juror.
It appears from the case that the State was permitted to prove that the prisoner had several times unlawfully sold liquor, in the presence of Oliver Layden, at his place of business. It is evident, we think, from the case and the charge of the court, that this (539) evidence was introduced to identify the prisoner as the one who had committed the homicide, and to show premeditation and deliberation in the killing. As the prisoner afterwards admitted that he killed Layden, and as the jury, by their verdict, negatived the existence of premeditation in doing the act, the testimony was harmless, if not, in itself, competent. S. v. Brantley, 84 N.C. 766, does not apply.
It appears from the evidence that the prisoner had threatened the deceased, and about the same time that some of the threats were made, he had prepared himself with a deadly weapon, a pistol of 38 caliber, to execute them, and he actually did use it for that purpose; and there was, in this case, direct evidence to connect the prisoner with the homicide — facts which did not exist in the Brantley case. Besides, the jury would hardly have acquitted the prisoner of the capital felony if they attached any importance whatever to this proof as showing a motive for the killing. They seemed to have clearly understood the case and the charge, and to have convicted the prisoner upon unobjectionable proof.
There was no error in permitting the articles found at the place of the homicide to be exhibited. This was, at least, competent for the purpose of identification, and if the prisoner was prejudiced thereby (and he does not appear to have been), it was merely incidental, and does not render the evidence incompetent. We find it stated in Underhill on Criminal Evidence, sec. 47, that "an article of personal property, the relevancy of which has been shown by its identification with the subject-matter of the crime, may be exhibited to the jury in the courtroom, either as direct evidence of a relevant fact or to enable them to understand the evidence, or to realize more completely its cogency and force."
the prisoner complains that, as stated in the case, "a ripple of laughter passed over the courtroom, and slightest applause — one or two *Page 446 
handclaps by ladies who were present." This was caused by a question asked of the State's witness, Robert Winslow, as to what had passed between him and defendant's counsel, and the further question (540) by the solicitor as to whether he had been summoned by the prisoner's counsel. The judge rebuked this demonstration very promptly and severely, and immediately instructed and cautioned the jury not to be influenced by it in the slightest degree, and we must assume that they followed his directions. The court evidently concluded that the incident, in view of the caution given to the jury, was harmless. The conduct of the trial must be left largely to the discretion and control of the presiding judge, and it would have to be a very extreme case to induce interference by this Court with the exercise of his judgment. He would undoubtedly have ordered a mistrial if he had thought that any prejudice to the prisoner had resulted from misconduct of the bystanders. In the absence of any finding by the judge to the contrary, we must hold, in support of his ruling, that the unfortunate disturbance was not of such character or proportions as to disqualify the jurors for the proper and unbiased discharge of their duties. We see nothing ourselves in the circumstances, as they appear in the record, to impeach the integrity of the verdict. This case is not likeS. v. Wilcox, 131 N.C. 707, for there the judge found as a fact that the prisoner had been prejudiced by the demonstration of the bystanders, which was of a very serious nature and plainly calculated to influence the jury. It is more like S. v. Harrison, 145 N.C. 408, in which it was said, at p. 414: "The defendant excepts because, during the argument of the solicitor, the defendant's counsel interrupted him to correct a statement. The solicitor made a sharp retort, whereupon a large part of the crowd in the courtroom broke into applause, which lasted several minutes. We find that the court reproved the audience in strong terms for the misconduct, required the solicitor to suspend his speech until it could be investigated, and called the officers before the court and inquired of them as to who engaged in the applause." The court did substantially the same thing in this case. In theHarrison case the exception of the prisoner, which was based upon the demonstration by the crowd, was overruled by this Court.
There is an exception to an instruction of the court upon the weight to be given to the testimony of interested witnesses, and to that of the defendant, but we think that the charge in this respect was very (541) full and explicit and conformed, at least, to the rulings in S. v. Byers, 100 N.C. 512, where the judge told the jury that "it was their duty to scrutinize the testimony (of certain witnesses) carefully, because of their interest in the result, but, notwithstanding such *Page 447 
interest, they might believe all they had said or only a part of it, or none of it, according to the conviction produced upon their minds of its truthfulness." This instruction was approved by this Court. Besides, the judge substantially charged in this case, as did the court in the Byerscase, that if they believed the defendant's testimony, they should acquit him. What stronger language, in favor of the prisoner, could he have used?
The prisoner further excepts because, as he says, the court charged the jury that the law presumed malice from a killing with a deadly weapon, and he would be guilty of murder in the second degree, unless he had shown, merely to their satisfaction and not beyond a reasonable doubt, such facts and circumstances as would reduce the killing to manslaughter or excusable homicide. It is objected that this instruction required the jury to consider only testimony introduced by the prisoner, and S. v. Castle, 133 N.C. 769, is cited in support of the proposition. But we do not think the instruction, when considered, not by itself, but with the context, has that effect. The court had before expressly instructed the jury that, in passing upon the matters set up in mitigation or defense, they should consider all the evidence in the case, "both that of the State and that of the prisoner." The judge did in this case precisely what it was said in Castle's case he should have done, and which he failed to do in that case. So Castle's case
supports the charge, which should be taken as a whole, and, as we have often said, construed, not textually, but contextually. It will not do to dismember the charge and consider the several parts without any reference to each other, but it must be viewed in its entirety. S. v. Exum,138 N.C. 600; Kornegay v. R. R., 154 N.C. 389; S. v.Lewis, 154 N.C. 632; Jeffress v. R. R., 158 N.C. 215, and S. v. Price, 158 N.C. 642. the case last cited is very much like this in the particular question raised. The charge of the court, as a whole, was a full and clear statement of the law as applicable to the facts, and is sustained by numerous authorities. S. v. Quick,150 N.C. 821; S. v. Rowe, 155 N.C. 436; S. v. (542)Simonds, 154 N.C. 197.
The prisoner, in the trial of this case, has had every advantage the law allows, and the jury, under the evidence and a clear and impartial statement of the law from the court, have rejected his version of the homicide. There was evidence of murder in the first degree, but the jury have taken a merciful view of the case and given the prisoner the benefit of the doubt, as between the two grades of felony, and convicted him of murder in the second degree. We find nothing in the record which should induce us to disturb the verdict or the sentence of the court. We cannot sustain the exception that the punishment imposed *Page 448 
by the court is, as matter of law, excessive, under the facts and circumstances of the case, for it is not so. If there are extenuating circumstances which do not now appear or of which the law takes no cognizance, relief must be sought from another source.
No error.
Cited: Herndon v. R. R., ante, 321, 324; Berbarry v. Tombacher, ante, 499; In re Smith, 163 N.C. 469; S. v. Fogleman, 164 N.C. 464; Ferebee v. R.R., 167 N.C. 297; S. v. Pollard, 168 N.C. 121; S. v. Foster, 172 N.C. 964.