This is an indictment against the prisoner for the murder of J. H. Nance, which the State alleges was committed under the circumstances detailed in the testimony of its witness, Ivey Sims, the substance of which is hereinafter set forth.
The State's witness, Ivey Sims, and the defendant, W. Y. Westmoreland, were in Statesville on the night of 20 October, arriving there about 11 o'clock. The defendant persuaded Sims to go with him to his home, which was below Troutman's, in Iredell County, telling him that he, Westmoreland, would hire a car and take him out there to spend the night, and would come back in time in the morning to take a train for *Page 591 
Landis, where the witness Sims resided. Westmoreland did hire the deceased, Nance, to take them out. A man named Alley went with them as far as Troutman. After Alley had left the ear they drove on to Westmoreland's home, and the following occurred, according to the testimony of Ivey Sims: "Just before he got to the house, I could see the bulk of the house, and the ear driver asked Mr. Westmoreland, `Is here where you live?' and Westmoreland said `Yes'. The car stopped in front of Mr. Westmoreland's home, right at the gate. When he drove up Mr. Westmoreland started to get out, and I started to get out right behind him, thinking he was going to pay the man, and let him go back to town, and he said, `You and the car driver stay here until I go in the house and see if there is any one at home.' The car driver got out and measured his gas, and he said, `I have more gas than I thought I had.' He said, `I didn't think I had but a gallon, but I have two gallons.' He got back up in his car and set down under the steering wheel, where he sat to drive his car. At that time I was in the back seat, sitting right behind the driver, where I sat coming down. I laid down in the back seat. I got sorter chilly driving down there, and had dozed off in a sleep, and he waked me up when he come back to the car — Mr. Westmoreland speaking to the car driver. He said, `Why the man in the back seat is about to go to sleep,' and the car driver turned his head like. The car driver said, `Yes; I believe he is,' and didn't more than say `Yes; I believe he is,' until the pistol fired. I raised in the back seat and said, `What in the world is the matter, Mr. Westmoreland?' He had the gun up that way (illustrating), and cut his eye over toward me, and never spoke, and leveled his gun and shot the man in the head again. I did not see the first shot fired. I heard it. That woke me up. I raised up then. When he fired his second shot the driver was sitting in his car in that position (illustrating) like he was looking down into the foot of the car. That was the second shot. I then stepped out of the car on the opposite side from where Mr. Westmoreland was standing. I stopped there side of it and was scared so bad I didn't know what to do or what to say, or what to think; and he said, after he shot him, `That is what I have been wanting to do for a long time.' He was sticking his gun back in his pocket and gave me orders to get up in the car and pull the man over the front seat, and he stepped up in the front seat, and I stepped up in the back seat, and was slow about taking hold, and he told me again, he said, `Take hold and let's get him in the back seat,' and he caught hold of the man under his legs that way (illustrating), and lifted him up, and some change fell out of his pocket, and he went through his pants' pockets and searched them. I don't know how much money he got, anyway, he got some, and stuck it in his pocket, and he found a gun on the seat or in the man's pocket one, and he said, `That is *Page 592 
what he has been toting for me,' and stuck it in his hip pocket, and he said, `Pull up on the man,' and I pulled up, and he lifted him, and we had him laying over the car something like that (indicating), and he gave him a throw, and throwed his legs in the foot of the car. I had to jump up on the back seat to keep him from falling on me, and he stepped out of the car and pushed his feet up in the car and shut the door, and said to me, `You get in the front seat here and ride with me.' I stepped out of the car and got in the front seat with him, and he cut the car around and started back up the road, where he come in toward the main road, and I said to him after he started, `What in the world are you going to do with the man, Mr. Westmoreland?' He said, `You keep your mouth shut and don't you say anything.'"
The prisoner denied that he killed Nance, and alleged and testified that Ivey Sims was the guilty party. We need not state any more of the testimony, as it is only necessary to show that there was evidence on the part of the State to support the verdict, as we are not weighing it, that being the province of the jury.
The prisoner was convicted of murder in the first degree, and from the judgment appealed to this Court. The prisoner assigned fifteen errors, the first three were abandoned, the fourth, fifth, sixth, and seventh will be hereinafter set forth. The eighth, ninth, tenth, eleventh, twelfth, and thirteenth will be discussed in the opinion without being set out in full, and the fourteenth and fifteenth are merely formal. The following objection to evidence and rejected prayers are those we deem it proper to state in full, numbered 4, 5, 6, and 7:
"4. The court erred in permitting the State to introduce or offer in evidence the coat and trousers of the witness Ivey Sims.
"5. The premeditation and deliberation necessary to constitute murder in the first degree must precede the killing. Acts and conduct of the defendant after the killing are not to be considered as evidence in this case that the defendant shot and killed the deceased and afterwards moved or caused him to be moved in the car, and loose change fell from his pockets, and later that the defendant searched the pockets of the deceased and took therefrom money, watch, and other articles of personal property, such acts would not be evidence of premeditation and deliberation, and you will not consider them as such.
"6. The court further charges you that the fact that the deceased was put in a well, if you find such to be a fact from the evidence, is not evidence of premeditation and deliberation, and the jury will not consider such act as evidence of premeditation and deliberation.
"7. The court further instructs the jury that if you find from the evidence that the defendant later took the car of the deceased and ran away *Page 593 
with it and was later arrested at Newton, and was found with articles of personal property, watch or any other property belonging to the deceased, such facts and circumstances would not be evidence of premeditation and deliberation, and the court instructs you not to consider them as such."
After stating the case: The six exceptions to the charge of the court were taken to that part of it which consisted in the statement by the court of the contentions of the State. We have examined these several instructions with a view of determining if the defendant could have been, in any degree, prejudiced by the manner in which the contentions were stated, and we have found nothing objectionable in them, but, on the contrary, they were exceedingly fair and impartial. The prisoner's contentions were stated in the same way, and nothing was said or omitted that could have prejudiced him in the least. These exceptions from Nos. 8 to 13, both inclusive, came within the well settled rule of the Court that objections to the statement of contentions must be made promptly so that they may be corrected. The latest cases on this subject are S. v. Hall,ante, 527; McMahan v. Spruce Co., 180 N.C. 636; Hall v. Giessell,179 N.C. 657. There was not the slightest intimation of opinion by the judge, and the prisoner has not, in law, been harmed by anything he said. This disposes of all the assignments of error except the three which were properly abandoned, the two which were merely formal, and the four which have been reserved.
The fourth assignment is without merit. The issue sharply raised by the contentions of the parties and the evidence was whether the prisoner or the witness, Ivey Sims, shot Nance, and in order to show that it was impossible that Sims could have done so, this coat and trousers were exhibited to the jury, which furnished evidence of the fact. We do not see why this was not competent and relevant as a circumstance to be considered and weighed by the jury in passing upon the disputed question as to which of the two men fired the fatal shots. As the prisoner has attempted by his own testimony to show that Sims carried a pistol in his hip pocket with which he did the shooting, it was clearly competent, by exhibiting his clothes, to show that this was impossible and therefore untrue. Similar evidence was admitted below in S. v. Vann, 162 N.C. 534, 539, and approved by this Court. It is said in Underhill on Criminal Evidence, see. 47: "An article of personal property, the relevancy of which has been shown by its identification with the *Page 594 
subject-matter of the crime, may be exhibited to the jury in the court room, either as direct evidence of a relevant fact or to enable them to understand the evidence, or to realize more completely its cogency and force." The prisoner objected to this evidence upon the ground that it was immaterial, and the ordinary rule in an appellate court confines him to the specified ground, but owing to the importance of the case we have discussed its competency generally. In his brief he insists that the evidence, "because of the great weight attached to an ocular demonstration," was prejudicial to him. This view is fully answered in S. v. Vann, supra. It is not a valid ground of objection to evidence that it tends to prove the fact in question more conclusively when the article to which it refers is exhibited, instead of being left to a mere description of witnesses. Such an objection fails to take into account the distinction between the strength of evidence and its competency or relevancy.
We come now to the three exceptions raising the question whether what occurred immediately after the homicide is evidence of premeditation and deliberation on the part of the prisoner.
There are authorities for the position that any unseemly conduct toward the corpse of the person slain, or any indignity offered it by the slayer, and also concealment of the body, are evidence of express malice, and of premeditation and deliberation in the slaying, depending, of course, upon the particular circumstances of the case. S. v. Robertson, 166 N.C. 356;People v. Beckwith, 108 N.Y., 67-75; Commonwealth v. Umilian,177 Mass. 582; Commonwealth v. Best, 180 Mass. 492; S. v. Dickson,78 Mo., 438; Duncan v. Commonwealth, 12 S.W. 673; 21 Cyc., pp. 897, 898. It was said in People v. Beckwith, supra: "Then followed immediate but well-considered mutilation of the body into convenient parts for burning and its attempted destruction, but especially, and first, such parts of it as contained peculiar marks, as the head, the hand, the foot. On the same day, falsehood by Beckwith as to the thing burning in the stove and the going away of Vandercook, his own flight, taking with him all articles of value or of use from the pockets of the dead man. These are among the circumstances which might well lead the jury to the conclusion that there was, on the part of the defendant, malice and an intention to kill, and that the killing by him of Vandercook was in pursuance of premeditation and deliberation, rather than the effect of sudden anger and without design." But we need not rest our decision on this ground or approve all that is said in some of the authorities we have cited, because we think there is evidence in the record that what occurred immediately after Nance was killed formed a part of a plan conceived by the defendant before the homicide was committed, he having deliberately and premeditatively determined beforehand not only to slay Nance, but also decided how he would conceal the dead body *Page 595 
so as to escape the penalty of the law for his crime. This was one thing that induced him to kill Nance as he considered it safe to do so, not being willing to take any chances with the law. He had planned for the disposal of the body by its concealment in the unused well, and his conduct as he and Sims left the place where the murder was committed, and what he said to Sims about where he was going and what he intended to do with the body, all went to show that he had thought out the entire scheme in the beginning and had weighed it before arriving at the definite conclusion to kill. The means of concealment and the secret disposal of the body, which he had devised and which he evidently believed would be successful, had emboldened him to commit the fatal act. His acts throughout were continuous, proving to be one connected whole. As soon as he had killed the deceased he instantly began to dispose of the body in such manner, with such precision of method and with such dispatch and expedition as to indicate that it was something he had was absolutely no necessity for doing so, as appears unless for the purconceived plan of murder. There was no time for reflection needed and consequently no hesitation about what he would do, because all of the thinking and deliberation had been done before. A somewhat similar question arose in Litton's case, 101 Va. 833, where the Court said, at page 843: "The homicide had been clearly proven, and there was direct evidence on the part of the Commonwealth to show intent, deliberation, preparation, and malice on the part of the prisoner by proof that he had in his possession shells fitting the gun he used, and which had been loaded previously to the homicide with similar shot to those which entered the body of the deceased. . . . It was clearly admissible, as we have said, to show deliberation, preparation, and malice; and the court having, in clear and unmistakable terms, instructed the jury to disregard it is they had reasonable doubt that the prisoner was connected with the two shells produced, there was no ground left upon which he could complain of its introduction." See, also, S. v. Brown, 168 Mo., 449; Luton v. S.,64 S.W. 1051. This case is stronger than either of those in its facts, and it differs in the respects enumerated from S. v. Foster, 130 N.C. 666, where flight alone was held not to be evidence of premeditation and deliberation, so as to raise the crime of murder to the first degree, the idea being that if Foster had committed only murder of the second degree or manslaughter, he might just as well have resorted to flight as a ready escape from punishment. But there are other facts and circumstances here which point to a time before the murder, and are of a more significant character. 3 Rice on Evidence, p. 221.
In Stanley v. S., 64 S.W. 1051, it is said: "Exception No. 2 of the defendant complained that the court erred in permitting the introduction of certain testimony going to show that, shortly subsequent to the *Page 596 
homicide, witness met appellant and that appellant had a target gun concealed on his person. The court states in the charge that said testimony was admitted as going to prove appellant's animus and thee condition off his mind, relating back to the intent with which he struck deceased and caused his death. It is well settled that declarations of appellant which tend to develop the res gestae or show the intent or motive with which the crime was committed, both before and after the crime, are admissible testimony."
The substantial question in our case is whether the prisoner or Sims fired the fatal shot, and the jury have settled that against him. There can scarcely be any doubt on the question of "premeditation and deliberation" or that it was done in cold blood. Why did the prisoner leave the motor car, go to his house in the dark and get his pistol? There was absolutely no necessity for doing so, as appears, unless for the purpose of using it as he did. He had ample time for reflection and the formation of a definite purpose to kill, and he was not long in executing his purpose, and so immediately did he do so as to leave no room for any but one conclusion, which is, that he intended too shoot Nance with it.
The other facts recited in the prayers for instructions, as to premeditation and deliberation, were competent, as they tended to show that he killed in the perpetration or attempt to perpetrate a robbery, which is especially mentioned in the statute as an act constituting murder in the first degree. They were pertinent circumstances to be considered by the jury in determining the degree of crime, and whether the prisoner had committed the highest felony in the law of homicide as defined by the statute or one of lower degree. C. S., 4200.
The prisoner was well acquainted with the neighborhood where the crime was committed and where he lived. He knew where to find the abandoned well, in which he intended to cast the dead body of his victim, and he carried out his preconceived plan with great secrecy, even telling Sims "to shut up" when the later inquired what he proposed to do with the body. When he had finished the gruesome task he had undertaken he stole Nance's car and fled to another county, believing that he would succeed in escaping detection, but the confession or betrayed of Sims frustrated his plans and defeated his purpose.
The court instructed the jury correctly as to whether any particular time must elapse before the homicide and after the deliberate and premeditated intent to kill has been formed. The cases on this subject are collected in the notes to section 4200 of the Consolidated Statutes, at p. 1732.
There was evidence which tended to show that the prisoner had done what he had previously intended to do, for he so expressly stated after the crime had been committed. *Page 597 
We have endeavored to consider and to carefully examine every material phase of this case presented in the record and in the able and impressive argument of the prisoner's counsel delivered before us, but after all this has been done, and with an earnest desire to reach the very truth of the matter, under the evidence and he law, and with careful and strict regard for the prisoner's rights, we can but conclude that there was no error in the trial of the cause.
No error.