STATE OF NORTH CAROLINA v. ERNEST RAY SIMMONS

No. 44

(Filed 14 April 1975)

1. **Jury § 6— capital punishment beliefs — questions by trial judge**

The trial judge had the right and duty to question prospective jurors in order to clarify their answers concerning their beliefs as to capital punishment.

2. **Jury § 5— excusal of juror by judge — absence of challenge**

In exercising his duty to see that a fair and impartial jury is impaneled, the trial judge, in his discretion, may in proper cases excuse a prospective juror without a challenge by either party.

3. **Constitutional Law § 29; Criminal Law § 135; Jury § 7— capital punishment beliefs — equivocal answers — excusal for cause**

Although a prospective juror's *voir dire* answers concerning her beliefs as to capital punishment were equivocal and not models of clarity, the trial court properly excused her for cause where a contextual consideration of the entire *voir dire* examination of the juror indicates that she could not vote for a guilty verdict in a capital case even though the State might have proved to her by the evidence beyond a reasonable doubt that defendant was guilty as charged.

4. **Jury § 5— standing prospective juror at bottom of panel — excusal for cause**

Any possible prejudice resulting from the court's standing of a prospective juror at the bottom of the panel was removed by her subsequent examination and excusal for cause. G.S. 9-21.

State v. Simmons

**5. Jury § 8— failure to read names of jurors before impaneling**

Failure of the court to have the clerk read the names of the jurors before the jury was impaneled was not prejudicial error where defendant failed to object to the failure to read the names of the jurors until after the jury was impaneled. G.S. 9-21.

**6. Constitutional Law § 32— oral waiver of counsel**

An indigent defendant's waiver of counsel prior to in-custody interrogation is no longer required to be in writing. G.S. 7A-457(c).

**7. Criminal Law § 76— admission of confession — necessity for findings of fact**

It is not error for the trial judge to admit a confession without making specific findings of fact where no conflicting testimony was offered on *voir dire,* although it is always the better practice for the court to make such findings.

**8. Criminal Law § 75— admissibility of incriminating statements**

The trial court properly admitted defendant's inculpatory statements in evidence where the uncontradicted evidence on *voir dire* was that defendant was fully advised of his constitutional rights prior to each interrogation or encounter with law enforcement officers; that on each occasion he knowingly, intelligently and voluntarily waived those rights; and that he then proceeded to make inculpatory statements or otherwise to aid law enforcement officers in the investigation of this crime.

**9. Criminal Law § 42; Homicide § 20— admission of pistol "similar" to one owned by deceased**

In a prosecution for murder committed in the perpetration of burglary and robbery, the trial court did not err in the admission of a pistol allegedly belonging to deceased where witnesses testified the pistol was "similar" to the one owned by deceased and a witness identified the pistol as one he bought from another person charged with this crime but tried separately.

**10. Homicide § 25— felony-murder indictment — allegation of two felonies — guilt of killing in perpetration of either felony**

In a prosecution upon an indictment charging murder in the perpetration of the felonies of burglary and attempted robbery, the trial court did not err in instructing the jury it could return a verdict of first degree murder if it found the killing was committed in the perpetration of either burglary or attempted robbery where the felonies charged constituted part of the same transaction.

**11. Homicide § 28— defense of intoxication — instructions — error favorable to defendant**

The trial court's instruction on intoxication in a homicide case contained error in defendant's favor, and defendant cannot complain thereof, where the court failed to instruct the jury that a defendant must be so drunk as to be utterly incapable of forming a specific intent and that the burden was on defendant to prove to the satisfaction of the jury his plea of intoxication.

**12. Constitutional Law § 36; Criminal Law § 135— constitutionality of death penalty**

The death penalty as imposed in North Carolina does not violate the principles of *Furman v. Georgia*, 408 U.S. 238.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to death sentence.

APPEAL by defendant from *Webb, S. J.*, 10 June 1974 Criminal Session of NASH Superior Court.

Defendant was tried upon a bill of indictment, proper in form, which charged that Ernest Ray Simmons "unlawfully and wilfully, feloniously and of his malice aforethought did kill and murder Mary C. Powell which said murder was committed in the perpetration of the felony crime of burglary and the attempted perpetration of the felony crime of robbery. . . ." Defendant, through his court-appointed counsel, entered a plea of not guilty.

The State's evidence tended to show the following facts:

On Saturday morning, 15 December 1973, Almeta Mills, a part-time domestic employee, went to the Powell home to work and there discovered Mrs. Powell's body on the floor near a fireplace in the front room. She immediately went to Ned Pittman's house for help. Pittman, who lived on Mrs. Powell's farm, went to Avent's Store and requested Mrs. Avent to notify the Nash County Sheriff's Department. Mrs. Powell lived alone, and Ned Pittman had cut wood and placed it on her porch on the preceding Friday but did not see Mrs. Powell at that time.

James Harrison, apparently the last person to see Mrs. Powell alive, testified that he went to Mrs. Powell's house on Thursday, 13 December, between four o'clock and five o'clock p.m. and talked with her at that time. Several witnesses testified that they observed an orange-colored automobile with a light top and fluorescent stripes parked across the road from Mrs. Powell's house between the hours of 8:00 and 9:30 p.m. on the night of 13 December.

Dr. D. E. Scarborough, a physician specializing in pathology, testified that the cause of Mrs. Powell's death was hemorrhage resulting from gunshot wounds.

Jimmie Smith testified that he purchased and gave to Mrs. Powell a .25 caliber automatic Galese pistol and further stated

that the pistol marked State's Exhibit 5 was similar to the pistol which he gave Mrs. Powell some five years prior to her death. Ernest Richardson identified State's Exhibit 5 as the pistol which he purchased from Frank Silver, the other person charged with this crime but tried separately. Richardson said that Silver first offered to sell him the pistol on 14 December 1973, but he and Silver could not agree on a price. Silver returned to the Richardson home on 18 December and completed the sale. Two or three days later Nash County Sheriff G. O. Womble, an S.B.I. agent, and Frank Silver went to the Richardson house, and Richardson at that time gave the pistol to the S.B.I. agent.

Martha Jones testified that defendant came to her house on the night of 13 December 1973. Later in the evening Frank Silver, his wife, his child, his brother, and his sister came to her home in a red automobile with a white top driven by Silver. Silver and defendant left in Silver's car, and when they returned about an hour later, defendant asked her for a shotgun. She observed that he had been drinking and would not let him have the gun. The two men left again but returned later in the night. They both then left her home, and she did not see either of them again that night.

William D. Driver testified that he sold Frank Silver four Victory .12 gauge shotgun shells on the night of 13 December 1973.

Sheriff Womble testified that on 15 December 1973, along with other law enforcement officers, he went to the home of Mrs. Mary Powell, where he found her body lying in the front room in front of the fireplace. He observed a hole in the right middle pane of the window located to the right of the front door, and glass was spread all over the room. A gun wadding was found near the body. One of the other officers discovered a spent .12 gauge gun shell in the driveway leading to the Powell house. Over objection of defense counsel and after conducting a *voir dire* examination, Judge Webb allowed Sheriff Womble to relate to the jury certain inculpatory statements made to him by defendant. Further facts concerning the content and admissibility of these statements appear in the opinion.

Defendant offered no evidence.

The jury returned a verdict of guilty of murder in the first degree, and Judge Webb imposed the mandatory death sentence.

*Attorney General James H. Carson, Jr., by Assistant Attorneys General William F. O'Connell and William Woodward Webb, for the State.*

*Thomas W. Henson for defendant.*

BRANCH, Justice.

Defendant contends that the trial judge committed prejudicial error by questioning prospective jurors concerning their views as to capital punishment and by removing Juror Dozier from the jury panel because of her views concerning capital punishment.

[1] This Court considered and answered the first portion of defendant's contention in *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817. There the Court stated: "It was error for the trial judge to refuse to allow counsel for defendant and the Solicitor for the State to inquire into the moral or religious scruples, beliefs and attitudes of the prospective jurors concerning capital punishment." Certainly the trial judge in the exercise of his duty to supervise and control the trial so as to insure a fair trial to all parties had the right and duty to interrogate prospective jurors in order to clarify their answers concerning their beliefs as to capital punishment. *State v. Strickland,* 254 N.C. 658, 119 S.E. 2d 781.

By this assignment of error defendant also argues that Judge Webb offended the principles advanced in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776.

During the *voir dire* examination of Juror Dozier, the following exchange occurred:

"Q. Mrs. Dozier, do you have any moral or religious scruples or beliefs against capital punishment?

A. Yes, I don't believe in killing.

Q. On account of your beliefs about capital punishment, would it be impossible under any circumstances and in any event for you to return a verdict of guilty as charged, even though the State were to prove the defendant's guilt beyond a reasonable doubt? I am asking would you be able to return a verdict of guilty if we satisfied you that the defendant was guilty and satisfied you from the evidence and beyond a reasonable doubt, knowing that upon that

verdict the defendant would be sentenced to die in the gas chamber—would you be able to return a verdict of guilty under those circumstances?

JUROR DOZIER: I don't understand you.

Q. You told me you did not believe in the death penalty and in killing?

A. Yes.

Q. I ask you with that belief would it be impossible for you to find the defendant guilty, if the State satisfied you from the evidence and beyond a reasonable doubt that he is guilty—if the State proved his guilt beyond a reasonable doubt, would it be impossible for you to return a verdict of guilty, knowing he would be sentenced to die in the gas chamber?

A. I don't know what to say there, to tell the truth.

THE COURT: As I understand it, you say you do not believe in capital punishment?

A. Yes, sir.

THE COURT: Even though the State's evidence satisfied you or all the evidence satisfied you beyond a reasonable doubt that the defendant is guilty, would it be impossible for you to return a verdict of guilty knowing that if you did so the defendant would be sentenced to die in the gas chamber—do you understand my question?

A. (No answer.)

THE COURT: Well, let me phrase it another way. If you should be satisfied from the evidence beyond a reasonable doubt that the defendant was guilty, would you find him guilty in this case?

A. No.

THE COURT: You would not? And is the reason you would not be because you would know that would cause him to be sentenced to die in the gas chamber? Do you understand the question?

A. No, not definite I don't.

THE COURT: Well, as I understood it, you said that even though all the evidence convinced you beyond a reasonable doubt that the defendant was guilty, you would not find him guilty. Is that the way you answered the question?

A. That is the way I understood it.

THE COURT: Well, is that the way you meant to answer it—you would find the defendant not guilty even though all the evidence convinced you beyond a reasonable doubt that he was guilty? I am not trying to put words in your mouth, I just want to know if that is the way you answered that question? Do you understand my question to you? You understand that you are going to be called on as a juror, once the evidence is in, to return to the jury room and then vote as to whether this defendant is guilty or not guilty. Do you understand that?

A. Yes, I understand that.

THE COURT: You understand that is what your function as a juror will be?

A. Yes.

THE COURT: That is what your duty as a juror will be. Do you understand that?

A. Yes, I understand that but I don't know.

THE COURT: If all the evidence convinced you beyond a reasonable doubt that the defendant was guilty of first degree murder, would you vote for a verdict of guilty of first degree murder—do you understand that question? If you were convinced after hearing all the evidence if you were convinced beyond a reasonable doubt that the defendant was guilty of first degree murder, what would you vote for? Would you vote for guilty or not guilty?

A. I would vote for not guilty.

THE COURT: And is the reason you would vote for not guilty is because you would know if you voted for a verdict of guilty, if the defendant were found guilty, what the sentence would be, that is that he would be sentenced to die in the gas chamber—is that the reason you would vote for not guilty, even though you were convinced beyond a reasonable doubt that he was guilty?

A.  (No answer.)

THE COURT: All right. Well, the Court will excuse you from the trial of this case then. Thank you.

MR. HENSON: On what grounds?

THE COURT: I am excusing her in the discretion of the Court. I am excusing her as a juror."

[2]   A defendant is not entitled to a jury of his choice but only to "a jury selected pursuant to law and without unconstitutional discrimination against a class or substantial group of the community from which the jury panel is drawn. He has no 'vested right to a particular juror.' " *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241, *reversed as to punishment,* 403 U.S. 948, 91 S.Ct. 2283, 29 L.Ed. 2d 859; *State v. Vann,* 162 N.C. 534, 77 S.E. 295. In exercising his duty to see that a fair and impartial jury is impaneled, the trial judge, in his discretion, may in proper cases excuse a prospective juror without a challenge by either party. *State v. Atkinson, supra; State v. Vann, supra; State v. Vick,* 132 N.C. 995, 43 S.E. 626.

Although there was no formal challenge of Juror Dozier by the State and the trial judge stated that he excused the juror "in the discretion of the Court," it is obvious from the circumstances disclosed by the record that the juror was excused because of her expressed scruples against capital punishment. Thus, our remaining question under this assignment of error focuses upon whether Juror Dozier's responses to questions on *voir dire* indicated that, knowing that the penalty would be death, she could not return a verdict of guilty, even though the State proved to her by the evidence and beyond a reasonable doubt that the defendant was guilty of the capital crime charged. *Witherspoon v. Illinois, supra; State v. Washington,* 283 N.C. 175, 195 S.E. 2d 534, *cert. denied,* 414 U.S. 1132, 94 S.Ct. 873, 38 L.Ed. 2d 757; *State v. Cook,* 280 N.C. 642, 187 S.E. 2d 104; *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652, *vacated as to punishment,* 409 U.S. 1004, 93 S.Ct. 453, 34 L.Ed. 2d 295.

It is now established in this jurisdiction that even though a prospective juror's *voir dire* answers to questions concerning his beliefs as to capital punishment may be equivocal and not models of clarity, it is proper for the trial judge to excuse the juror for cause when a contextual consideration of the entire *voir dire* examination indicates that the juror could not vote for

a verdict which would result in the imposition of the death penalty. *State v. Avery,* 286 N.C. 459, 212 S.E. 2d 142; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750. *See* Annotation, 39 A.L.R. 3d 550.

[3] We hold that, when considered contextually, the answers of the prospective Juror Dozier reveal that she could not vote for a verdict of guilty in this capital case even though the State might have proved to her by evidence beyond a reasonable doubt that defendant was guilty as charged. We note that the record fails to show that defendant exhausted his peremptory challenges.

The only argument brought forward in defendant's brief concerning removal of jurors from the panel relates to Juror Dozier. We have nevertheless carefully examined the exceptions as to the removal of other jurors and find no error prejudicial to defendant.

[4, 5] Defendant assigns as error the action of the trial court in standing the Juror Sharpe at the foot of the panel and in failing to have the names of the jurors read prior to impaneling the jury.

The purpose or requiring the Clerk to read the names of the jurors is to enable a defendant to exercise intelligently his right to challenge before the jury is impaneled. *State v. Fountain,* 282 N.C. 58, 191 S.E. 2d 674. Here counsel for defendant interposed no objection to the Clerk's failure to read over the names of the jurors until after the jury was impaneled. The record is silent as to whether counsel had a written list of the jurors. Furthermore, any possible prejudice resulting from standing Juror Sharpe at the foot of the panel was removed by her subsequent examination and excusal for cause. The State concedes that a technical violation of the provisions of G.S. 9-21 occurred, but takes the position that such error was not prejudicial, particularly since defendant did not object prior to the impaneling of the jury. We agree. This assignment of error is overruled.

Defendant assigns as error the admission into evidence of his custodial confession.

[6] He first argues that the confession was inadmissible because there was no written waiver of counsel. He relies upon *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561, in which this Court

State v. Simmons

interpreted G.S. 7A-457 to hold that all waivers of counsel by indigent persons must be in writing. However, by Chapter 1243 of the Session Laws of 1971, the General Assembly amended G.S. 7A-457, effective 30 October 1971, by adding Subsection (c), which provides:

"An indigent person who has been informed of his right to be represented by counsel at any out-of-court proceeding, may, *either orally or in writing,* waive the right to out-of-court representation by counsel." (Emphasis supplied.)

The challenged statement was made subsequent to 30 October 1971, and the 1971 enactment by the Legislature supersedes that portion of *Lynch* which interpreted G.S. 7A-457 to require that all waivers of counsel by indigent persons be in writing. This portion of defendant's argument obviously lacks merit. We therefore turn to the question of whether defendant's custodial statements were voluntarily made.

When the Assistant District Attorney asked Sheriff Womble to relate to the jury a statement made to him by defendant, counsel for defendant objected. The trial judge thereupon properly excused the jury and conducted a *voir dire* hearing concerning the admissibility of this statement. On *voir dire* Sheriff Womble testified that he talked to Ernest Ray Simmons on 20 December 1973 about the death of Mrs. Mary C. Powell. The Sheriff testified that, before defendant made any inculpatory statements, the following exchange between the Sheriff and defendant occurred:

"I told him I wanted to talk to him about the death of Mrs. Powell; told him that the law required me to warn him of his rights; he did not have to make any statements, other than what he had given me, his name and his address. Told him that anything that he did make could and would be used against him in court; that he had a right to an attorney if he wanted one, of his own choosing; and if he wanted one and wasn't able to afford one that one would be appointed him before any questions was [sic] asked, or during questioning. I also told him that if he decided to make any statements or answer any questions that he had a right to quit talking at any time he wanted to; and I asked him if he understood his rights and he said he did. I asked if he understood what I had said to him. He said he did. I asked him if he wanted a lawyer

now. He said he did not. I asked him if he wanted to make some statements. He said he did."

The Sheriff further testified that he promised defendant nothing, that he did not threaten defendant, and that defendant, who appeared "normal," talked freely and appeared to understand all questions asked him.

Simmons then, in substance, told the Sheriff that on the night of 13 December 1973 he and Frank Silver went to Mrs. Powell's home after parking Silver's automobile across the road. He went to the house and looked in while Silver waited for him near a fence. Mrs. Powell was looking at television, and he at that time saw what he described as a big dog in the house. He then told Silver that he was not going into the house without a gun. Thereupon they went to Martha Jones's house, where Simmons unsuccessfully attempted to get a gun. Silver told him that he knew where they could get a gun. They stopped at Driver's Store, where Silver purchased four shotgun shells, and then proceeded to the home of Silver's father, where they obtained a shotgun. Upon returning to the vicinity of the Powell home, Silver parked his car in a path across the road from the Powell home. Silver was loading the gun as they walked along the driveway to the Powell house, and it accidently went off. Silver breached the gun, and the shell flew out. When Mrs. Powell looked out the window, they left and approached the house from a different direction. With Simmons leading the way, they finally came to the front of the house. He again looked in, saw Mrs. Powell, and told Silver that she was "poking in the fire." Silver stepped up and shot her through the window. The Sheriff stated on cross-examination that Silver had said "that Ernest was the one doing the shooting." The Sheriff also stated that he talked with Simmons on Friday, 21 December 1973, and Saturday, 22 December 1973, and on these occasions Simmons made statements which further implicated him in the killing. Before talking to Simmons on 21 December and 22 December, he again warned Simmons of his rights in language substantially the same as that employed prior to his interrogation on 20 December. The only other State's witness on *voir dire* was SBI Agent E. H. Cross, who testified that at the request of Sheriff Womble he went to the farm where defendant worked and requested him to come in to talk to the Sheriff. Defendant agreed to accompany him to Nashville. He did not interrogate defendant, but he did "warn him of his rights" after they reached the courthouse.

Defendant offered no evidence on *voir dire*. At the conclusion of the *voir dire* hearing, Judge Webb found and ruled as follows:

" . . . Let the record show then at the end of the voir dire hearing, the Court finds as a fact that on the dates of December 20, 21, 22, 1973, at the time of questioning the defendant that Glenn O. Womble, Sheriff of Nash County, before receiving any statement from the defendant, fully advised him of his right to remain silient [sic]; his right to have counsel represent him; his right to have the State pay for counsel if he could not afford counsel and warned him of his possible self-incrimination. That the defendant fully understood these rights; that he freely, voluntarily and understandingly waived his right to remain silent and to have counsel present at any questioning. Any statements the defendant made to the sheriff, Glenn O. Womble, on December 20, 21 and 22, 1973 are admissible in evidence. The defendant's objections to these questions are overruled."

**[7, 8]** It is familiar law that, where competent evidence supports the findings of fact of a trial judge concerning the voluntariness of a custodial statement, such findings are binding upon an appellate court. *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844; *State v. Smith,* 278 N.C. 36, 178 S.E. 2d 597, *cert. denied,* 403 U.S. 934, 91 S.Ct. 2266, 29 L.Ed. 2d 715; *State v. Wright,* 274 N.C. 380, 163 S.E. 2d 897. Further, where, as here, no conflicting testimony is offered on *voir dire,* it is not error for the judge to admit the confession without making specific findings of fact. *State v. Lynch, supra; State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511; *State v. Keith,* 266 N.C. 263, 145 S.E. 2d 841. As we noted in *Lynch,* however, it is "always a better practice for the Court to find the facts upon which it concludes any confession is admissible." In instant case the facts are uncontradicted that defendant was fully advised of his constitutional rights prior to each interrogation or encounter with law enforcement officers; that on each occasion he knowingly, intelligently, and voluntarily waived these rights; and that he then proceeded to make inculpatory statements or otherwise to aid law enforcement officers in the investigation of this crime.

We hold that the evidence fully supports the trial judge's findings, conclusions, and ruling admitting into evidence defendant's inculpatory statements. This assignment of error is overruled.

**[9]**  Defendant next contends that the Court committed prejudicial error by admitting into evidence State's Exhibit 5, the pistol allegedly belonging to deceased. Defendant seems to take the position that since witnesses were able to testify only that the pistol was similar to the one used by deceased without positively identifying the weapon as being the property of the deceased, the pistol should not have been admitted into evidence.

The general rule in this jurisdiction is that weapons may be admitted into evidence upon such testimony "where there is evidence tending to show that they were used in the commission of a crime." *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22. In *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38, this Court stated:

> " . . . Any article shown by the evidence to have been used in connection with the commission of the crime charged is competent and properly admitted into evidence. *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190 (1968). 'So far as the North Carolina decisions go, any object which has a relevant connection with the case is admissible in evidence, in both civil and criminal trials. Thus, weapons may be admitted where there is evidence tending to show that they were used in the commission of a crime or in defense against an assault.' 1 Stansbury's North Carolina Evidence § 118 (Brandis rev. 1973)."

In *State v. Macklin,* 210 N.C. 496, 187 S.E. 785, it was proved that the deceased was killed with a shotgun. A single-barrel shotgun was found in the defendant's room, and a witness testified that the gun "was like the one" carried by defendant on the night deceased was shot. This Court held that the shotgun was properly admitted into evidence. *Accord: State v. Crowder, supra; State v. Patterson,* 284 N.C. 190, 200 S.E. 2d 16; *State v. Bass,* 280 N.C. 435, 186 S.E. 2d 384; *State v. Muse,* 280 N.C. 31, 184 S.E. 2d 214, *cert. denied,* 406 U.S. 974, 92 S.Ct. 2409, 32 L.Ed. 2d 674, *rehearing denied,* 409 U.S. 898, 93 S.Ct. 99, 34 L.Ed. 2d 157; *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561; *State v. Jarrett,* 271 N.C. 576, 157 S.E. 2d 4; *State v. Fikes,* 270 N.C. 780, 155 S.E. 2d 277; *State v. Keith, supra.*

Finally, any doubt as to the admissibility of State's Exhibit 5 was dispelled by the testimony of the witness Ernest Richardson, who testified without objection or motion to strike that "[t]he Exhibit you are showing me marked State's Exhibit 5 for identification is the pistol." He further testified that he

bought this pistol from Frank Silver on 18 December after negotiations which began on 14 December 1973. The testimony of the witness Richardson, when coupled with the testimony of several other witnesses that State's Exhibit 5 was similar or looked like the pistol formerly belonging to deceased, was sufficient to establish relevancy and identity of the weapon and thereby make it properly admissible into evidence. There is no merit in this assignment of error.

[10] Defendant next contends that the trial judge erroneously charged the jury with respect to the definition of the crime charged. More particularly, he argues that, since the indictment charged murder in the perpetration of the felonies of burglary *and* attempted robbery, it was prejudicial error for the trial judge to instruct the jury that it could return a verdict of guilty of murder in the first degree if it found that the killing was committed in the perpetration of *either* burglary *or* attempted robbery.

G.S. 14-17, in pertinent part, provides:

"A murder . . . which shall be committed in the perpetration or attempt to perpetrate any arson, rape, *robbery, kidnapping, burglary* or other felony, shall be deemed to be murder in the first degree and shall be punished ; with death. . . . " (Emphasis supplied.)

In interpreting this statute, we have stated:

"It is evident that under this statute [G.S. 14-17] a homicide is murder in the first degree if it results from the commission or attempted commission of *one* of the four specified felonies or of any other felony inherently dangerous to life, without regard to whether the death be intended or not."

*State v. Streeton*, 231 N.C. 301, 56 S.E. 2d 649.

We are unable to find any case precisely governing the point here raised. However, we think that some light is shed upon the question by *State v. O'Keefe*, 263 N.C. 53, 138 S.E. 2d 767, *cert. denied*, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed. 2d 277. There defendant was charged with crime against nature in violation of G.S. 14-177. The indictment did not specify whether the unnatural sexual act was *per os* or *per anum*, but the evidence for the State tended to show the commission of both

State v. Simmons

types of crime as a part of the same incident. In rejecting a challenge to the sufficiency of the indictment, this Court made the following statement:

> " 'Acts entering into a single and continuous transaction may be charged together as a single offense.' 42 C.J.S., Indictments and Informations, § 164, p. 1117; *State v. Sherman*, 107 P. 33 (Kan.). Where a single offense may be committed by several means, it may be charged in a single count if the ways and means are not repugnant and are component parts of one transaction. *State v. Laundy*, 204 P. 958 (Ore.). Proof of any one means will support conviction. *United States v. Otto*, 54 F. 2d 277 (C.C. 2d). And an instruction to this effect is not error. *State v. Davis*, 203 N.C. 47, 53, 164 S.E. 732."

The requirement that the indictment in such a case as this one be couched in the conjunctive rather than the disjunctive is a sound rule of criminal pleading designed to inform the defendant of the crime for which he stands charged. *State v. Sellers*, 273 N.C. 641, 161 S.E. 2d 15; 42 C.J.S. *Indictments and Informations* § 166; 41 Am. Jur. 2d *Indictments and Informations* § 96. However, where, as here, the felonies charged clearly constitute part and parcel of the same transaction, we perceive no usful purpose in requiring that the proof must indicate the commission of *both* crimes. A finding that the homicide was committed in the perpetration of *either* crime suffices to support the conviction of murder in the first degree. We hold that it was not prejudicially erroneous for the trial judge to instruct that sufficient evidence of the perpetration of either felony would suffice to bring defendant within the felony-murder provision of G.S. 14-17.

Defendant contends that the trial judge erred in his instructions to the jury on intoxication as a defense. The trial judge, in part, charged:

> "Generally, voluntary intoxication is not an excuse for a crime. However, if you should find the defendant was intoxicated you should consider whether this condition affected his ability to fomulate [sic] the specific intent which is required in this case. First of all as I charged you on attempted armed robbery, you would have to be satisfied beyond a reasonable doubt that the defendant intended to rob Mary C. Powell; or you would also have to be satisfied

if it is an attempted armed robbery that the defendant intended to deprive Mary C. Powell of the use of her property permanently. You would also have to be satisfied beyond a reasonable doubt that the defendant knew he was not entitled to take the property.

"As for a burglary, you would have to be satisfied beyond a reasonable doubt, in order for you to find that there was a burglary in progress, you would have to be satisfied beyond a reasonable doubt that at the time of the breaking and entering the defendant intended to commit some felony, in this case, robbery.

*          *          *

"Ladies and gentlemen of the jury, I have been asked to charge you, which I will do, if considering the evidence with respect to the defendant's intoxication you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of murder in this case, you will return a verdict of not guilty."

One of the essential elements of attempted robbery is the felonious intent to deprive the owner of his property permanently and to convert it to the use of the criminals. *State v. Norris,* 264 N.C. 470, 141 S.E. 2d 869. Likewise, one of the essential elements of the crime of burglary is the intent to commit a felony in the dwelling house broken into. *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10. If, at the time Mrs. Powell was killed, defendant was so drunk that he could not have formed the felonious intent required in order to constitute the crimes of burglary and attempted robbery, he could not be guilty of murder in the first degree since the State proceeded on the felony-murder theory, *i.e.,* the theory that the murder was committed in the perpetration of a felony. An essential element of both crimes would be lacking, and the murder could not have been committed in the perpetration of the specified felony. *State v. Hamby,* 276 N.C. 674, 174 S.E. 2d 385; *State v. Propst,* 274 N.C. 62, 161 S.E. 2d 560; *State v. Biggs,* 224 N.C. 722, 32 S.E. 2d 352; *State v. Kelly,* 216 N.C. 627, 6 S.E. 2d 533; *State v. Sterling,* 200 N.C. 18, 156 S.E. 96.

[11] We do not think that there was sufficient evidence in instant case to require the trial judge to submit the plea of intoxication. Further, one of the principal omissions in the charge on intoxication was the stringent language adopted by this Court

to the effect that a defendant must be so drunk as to be utterly incapable of forming a specific intent. Neither did the trial judge instruct the jury that the burden was upon defendant to prove to the satisfaction of the jury his plea of intoxication. *State v. Creech,* 229 N.C. 662, 51 S.E. 2d 348; *State v. Absher,* 226 N.C. 656, 40 S.E. 2d 26. Thus, the instruction complained of, if erroneous, contained error in defendant's favor, and he cannot be heard to complain of such error. *State v. Cook,* 263 N.C. 730, 140 S.E. 2d 305; *State v. Holbrook,* 232 N.C. 503, 61 S.E. 2d 361; *State v. Johnson,* 229 N.C. 701, 51 S.E. 2d 186; *State v. King,* 222 N.C. 239, 22 S.E. 2d 445; *State v. Levy,* 220 N.C. 812, 18 S.E. 2d 355; *State v. Carpenter,* 215 N.C. 635, 3 S.E. 2d 34; *State v. Whitehurst,* 202 N.C. 631, 163 S.E. 683. We find no prejudicial error in this assignment.

[12] Defendant assigns as error the entry of the judgment of death and presents the contention that the death penalty as imposed in North Carolina violates the principles of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346. All of the contentions which defendant presents under this assignment of error have been considered and rejected by this Court in numerous recent cases. *See, e.g., State v. Lampkins,* 286 N.C. 497, 212 S.E. 2d 106; *State v. Avery, supra; State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113; *State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712; *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844; *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803; *State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6; *State v. Noell, supra; State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721; *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19. On the authority of these cases, this assignment of error is overruled.

We have carefully examined each assignment of error as well as the entire record of this case and perceive no reversible error.

No error.

Chief Justice SHARP dissents as to the death sentence and votes to remand for the imposition of life imprisonment for the reasons stated in her dissenting opinion in *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975).

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for

the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422 at 437, 212 S.E. 2d 113 at 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.